UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:11-CR-00185-JAW |
| | ) | |
| JAMES STILE, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTIONS TO SUPPRESS**

Defendant James Stile is charged in an indictment with robbery of controlled substances from a DEA registered pharmacy, use of a firearm in a crime of violence, unlawful possession of a firearm by a felon, and the manufacture of more than 100 marijuana plants. The Government also presses forfeiture charges. Stile has filed two motions to suppress statements he gave to law enforcement. One motion seeks the exclusion of statements based on alleged <u>Miranda</u> and Sixth Amendment violations. (ECF No. 94.) The other seeks the exclusion of statements on the ground that they were involuntary. (ECF No. 96.) The Court referred both motions for report and recommended decision. I conducted a hearing on December 13, 2012, in which the parties presented the Court with both testimonial and documentary evidence. At the close of the hearing, I invited defense counsel and the Government to submit supplemental briefs. I also allowed the record to remain open until the close of business on December 20, 2012, in order to allow Defendant to submit any objections he might identify concerning the accuracy of government-supplied transcripts of audio and video recordings of custodial interviews. No such objection was filed, but defense counsel did submit a brief that flags statements by Stile that Stile

contends were assertions of his <u>Miranda</u> rights.  (ECF No. 134.)  The Government, for its part, has filed two memoranda in connection with Stile's motions to suppress statements.  (Response to Motions, ECF No. 116;  Supplemental Response Brief, ECF No. 135.)  For reasons that follow, I recommend that the Court GRANT IN PART the <u>Miranda</u>-based motion (ECF No. 94) and deny the other motion to suppress statements (ECF No. 96).

PROPOSED FINDINGS OF FACT

A masked male gunman robbed the E.W. Moore Pharmacy in Bingham, Maine, in the late afternoon of September 12, 2011.  Roughly 25 minutes later, Piscataquis County sheriff's deputies stopped James Stile driving northbound on Route 16 in Abbot, Maine.  The traffic stop was founded upon articulable reasonable suspicion, as explained in a companion recommended decision filed January 2, 2013 (ECF No. 133).  As a result of the traffic stop and information gathered at the scene of the crime, law enforcement secured a warrant to search Stile's property in Sangerville, Maine, on September 13.  (Robbery-Related Search Warrant and Search Warrant Affidavit, Gov't Ex. 16.)  Shortly after executing this search warrant, law enforcement discovered a marijuana grow operation and obtained a second warrant to search Stile's premises for evidence related to unlawful marijuana cultivation.  (Marijuana-Related Search Warrant and Search Warrant Affidavit, Gov't Ex. 17.)  Neither warrant is challenged in the pending motions. The issues pressed by Stile concern the voluntariness of statements he made during interviews conducted on the day of the search and during his subsequent incarceration at the Somerset County Jail.  Each of these interviews is described below.

**September 13, 2011, Interview**

Matthew Cunningham is a Somerset County Sheriff's Deputy and was present for the execution of the search warrant on September 13, 2011.  Cunningham testified at the suppression

hearing.  Cunningham's primary duty during the search was to attend to Stile outside of the premises.  Cunningham spent most of this time sitting with Stile in a police cruiser, but the men also spent time outside of the cruiser in Stile's yard.  Most of their conversation was captured in an audio recording.[1]

Stile remained handcuffed throughout the search and the Government has not argued that Stile was not in custody.  After some preliminary comments and introductions, Cunningham informed Stile about the warrant and that it was being executed because Stile committed an armed robbery in Bingham.  Cunningham stated that they had a video from the robbery and that there was no mistake about the fact that Stile was depicted in the video.  (Transcript at 6, Gov't Ex. 9T.)  Cunningham then stated that before he could ask Stile any questions he had to advise Stile of his rights.  After saying, "You have the right to remain silent, do you understand that," Stile responded that he thought he had better and expressed incredulity that he was being accused of robbery.  (Id.;  Audio Recording at 09:40, Gov't Ex. 9R.)  Cunningham then completed the warning and Stile acknowledged that he understood his rights.  Cunningham next queried, "Now, having those rights in mind, do you wish to answer any questions at this time?"  Stile responded negatively and Cunningham said, in a passive tone, "OK, fair enough."  (Transcript at 7.) However, Stile immediately rejoined with, "I don't know, what do you want to ask me?"  (Id.) Cunningham explained in a good natured, humorous tone that perhaps Stile did not understand his rights and offered to read them again.  Stile said, "Save it," and further indicated that he understood his "Miranda rights."  (Id. at 7-8.)  Thereafter, a conversation developed.  It is evident from the record that Stile was adequately warned and that Cunningham also explained that there would be no negative change in treatment if Stile chose to remain silent.  (Id. at 10.)

---

[1]      In my account, I have cited the Government-supplied transcript, which the Government filed in three parts, one for each of three audio CDs.  In some instances I have cited the CDs, either to indicate the passage of time or because of a discrepancy between what is captured by audio and what is written in the transcript.

Beginning at 14:40 on first audio CD, Stile can be heard saying, "Ask, and if I'm gonna answer, I'm gonna answer.  If I'm not, I'm not.  I have no problem.  You're a gentleman.  We're two human beings.  Go for it."  (<u>See also</u> Tr. a 10.)  From there, Stile essentially told Cunningham about his dislike for "cops" and gave an account of some personal history and of a prior experience with law enforcement related to antique firearms.  In the thirtieth minute of the interview, Cunningham turned the topic of conversation to the robbery, but then steered it toward the issue of whether Stile had a problem with narcotics.  (Tr. at 17-18.)  The conversation was then interrupted by a call and Cunningham informed Stile that they had just found the plates that were attached to the van during the robbery.  (<u>Id.</u> at 19.)  Focused interrogation concerning the robbery proceeded.  (<u>Id.</u> at 20.)  Cunningham explained that "sooner or later we're gonna end up arresting you anyway" and that the more Stile made him work, the worse Stile would make it for himself.  (<u>Id.</u> at 21.)  Stile then requested an opportunity to have his cigarettes and to stand outside and "smoke a cigarette and talk."  (<u>Id.</u>)  Cunningham agreed and repositioned his cruiser in Stile's driveway.  Stile then observed that "you guys have been courteous in your dealings here."  (<u>Id.</u> at 22.)  They got out of the car and Stile retrieved his cigarettes.

The outside conversation began with Stile's marijuana smoking habit and Marinol prescription and Cunningham's preference for chewing tobacco.  (<u>Id.</u> at 25-26.)  Cunningham then steered the conversation back to the robbery.  He said Stile was going to be arrested for armed robbery and it would not hurt him to be "straight up" about what happened.  Cunningham stated that he would not say it would help Stile, but that it would not hurt him to be able to have his attorney say in court that Stile was 100% cooperative with law enforcement and that the robbery was a result of a drug addiction and the fact that Stile's doctor "is an asshole and cut him off."  (<u>Id.</u> at 26.)  Stile indicated that Cunningham "had done some homework" and he said that

he had been on pain meds since 1988 and had been through two back surgeries.  He expressed

the perspective that he did not have a drug problem, but rather a back problem.  (<u>Id.</u>;  Audio

Recording at 44:12—44:22.)

Cunningham received another call and then informed Stile that he was just told of "the

duffle bag they found in the back of the vehicle" and that the amount of money discovered on

Stile was "about the amount of money stolen during the robbery."  Cunningham explained that

they would swab the cash for DNA and compare it with the teller's DNA to see if she had

handled the cash found in Stile's possession.  (Transcript at 27.)  Stile then asked, "Are you

asking me to confess to a crime, Mac?"  (<u>Id.</u>;  Audio Recording at 45:58.)  Stile rebuffed the

suggestion.  Cunningham then summoned another officer to relieve him for a spell.  Cunningham

retrieved a camera and returned to take some photographs of Stile.  (Transcript at 29.)   The

audio is insignificant for a long spell thereafter, until minute 68:58.  Cunningham then conversed

once more with Stile, asking about Stile's dog training and then asking about the amount of cash

found in his possession.  Stile ignored these focused inquiries and returned to the topic of dogs

and dog training.  (Transcript at 34-36.)  Eventually, Cunningham told Stile that he needed to

collect a DNA sample from Stile, by means of a cheek swab.  (<u>Id.</u> at 37;  Audio Recording at

1:14:22.)  Stile objected and questioned what authority existed to do so.  Cunningham indicated

it was the search warrant that gave the authority.  (Transcript at 37.)  Stile stated he was not

going to volunteer anything.  (<u>Id.</u>)  A similar conversation and objection arose concerning

fingerprinting.  Stile reviewed the search warrant and indicated that he did not know if it was

allowable and that he thought he would want to talk to a lawyer about it.  Cunningham stated that

Stile did not have that option.  (<u>Id.</u> at 38;  Audio Recording at 1:16:45.)  Stile persisted in his

objection, expressing an unwillingness to allow any of his "body fluids" to be collected.

(Transcript at 39.)  Cunningham told Stile he had no choice and that it would be taken and force would be used, if necessary.  (Id.)  Stile stated they would have to videotape it because there were less intrusive options.  (Id.)  Cunningham spoke in a matter of fact tone but explained that the search warrant provided the authority to take a DNA sample and that Stile could challenge the warrant at a later date.  (Id. at 40.)  Cunningham showed Stile the cotton swab and spoke some words of reassurance as to the simplicity of the procedure.  Stile relented in exchange for a promise that he could have a cigarette as soon as they were done.  (Id. 40-41.)  Another officer came over then and asked for the combination to the safe in Stile's home.  Stile refused, saying they would need a secondary warrant.  (Id. at 41.)  Cunningham stated they would just take the safe and deal with it later.  (Id.)  The men then exited the cruiser.  They can be heard conversing outside of the cruiser, but it is not apparent that there was any further interrogation.

The conversation picks up again on the second audio disk.  It appears that Cunningham and Stile were once more seated in Cunningham's cruiser.  Cunningham explained to Stile what had been found that led him to believe Stile had committed the robbery, namely:  the van, the plates, the money, the witness descriptions, the videos, clothing, the latex gloves (pieces of which were left behind at the pharmacy), a black bag that appeared to be used in the robbery, a jacket that appeared to be worn in the robbery, shoe prints found at the pharmacy, and a dust mask that appeared to be worn during the robbery.  (Transcript #2 at 1-3.)  Cunningham explained that what they did not yet have was "the gun" and certain other evidence, but he did not mention narcotics.  (Id. at 3.)  Cunningham then offered Stile an opportunity to give his story and "come clean," explaining that it could go better for him at court.  (Id.)  Cunningham exited the vehicle without Stile offering any confession and the second audio disk contains no further conversation other than inaudible sounds occurring outside of the vehicle.

The third audio CD begins with an unidentified male voice saying that they found dog hair on some zip ties and that they would match up the DNA in the hair to Stile's dogs. (Transcript #3 at 1.)  The transcript identifies this individual as Agent Brent McSweyn.  The Court recognizes McSweyn as an Agent with the Bureau of Alcohol, Tobacco and Firearms. The recording of McSweyn's conversation with Stile is muddled by some road traffic, but it is evident that McSweyn was attempting to elicit a confession from Stile by indicating his confidence that Stile committed the robbery and that he had been cut off from a prescription of Methadone.  (Id. at 2.)  There is an extended period of inaudible talk on the recording, but it can be determined that McSweyn was essentially running through the evidence of guilt.  (Id. at 4; Audio Recording #3 at 11:00.)  The conversation continued for some time, though it is overridden by traffic sounds and mostly inaudible.  If there was a confession it is not discernible on tape.  McSweyn explained that they were still looking for the guns and the drugs and that these were the only things left that Stile could assist them with and that Stile would no longer have an opportunity to demonstrate his helpfulness once they had these items.  (Transcript #3 at 7;  Audio Recording #3 at 20:00.)  On the recording, Stile can be heard to offer an alibi related to dog training and seeing some bear hunters in the woods, though this is not captured in the transcript.  (Audio Recording #3 at 21:15.)

Cunningham soon returned and he and McSweyn talked for a turn.  They showed Stile the gloves and the plates and Cunningham explained that they obtained a second search warrant after the discovery of the marijuana plants.  (Transcript #3 at 10.)  Cunningham then returned to the topic of coming clean.  He asked Stile where the drugs were and Stile denied ever having them.  (Id. at 10.)  Stile denied being a liar and Cunningham asked why he could not look him in the eye and deny doing the robbery.  (Id. at 11.)  Stile responded that anything he said could and

would be used against him.  (Id.)  Thereafter Stile and McSweyn digressed into a conversation of

the legality of certain imported cartons of cigarettes found at Stile's premises.

Stile next requested that he be able to sit outside and this request was granted.  McSweyn

collected a couple of chairs.  (Id. at 13-14;  Audio Recording #3 at 33:00.)  He and Stile were

eventually seated and talking together.  (Audio Recording #3 at 36:10.)  First they talked about

the fate of Stile's dogs and the issue of whether Stile was apt to get bail.  (Transcript #3 at 14-

15.)  Asked to admit responsibility, Stile said he regarded it as "speculative" and that he was just

taking it all in.  (Transcript #3 at 15.)  He then regaled McSweyn with some of the personal

history stories he shared with Cunningham earlier that day.  During the course of this, Stile

indicated that he had provided the officers with the combination to search the safe inside his

premises and that he did so because the officers had been fair to him and treated him decently.

(Id. at 18;  Audio Recording #3 at 43:12.)  Eventually, Cunningham returned and asked some

questions about the van.  (Transcript #3 at 24;  Audio Recording #3 at 51:50.)  Stile indicated his

ownership and that some other people had used the van, but he stated he did not think it prudent

to name them.  (Transcript #3 at 24.)  Stile indicated that he had been alone the prior day with his

dogs and that he was with them on a mountain road near a quarry and beaver pond and that he

had seen some bear hunters in the area.  (Id. at 25.)  Cunningham said they needed the drugs or at

least the guns, "or you're not gonna be able to make bail.  It's gonna be crazy."  (Id.)  Stile

responded that he could not give what he did not have and that he would, if he could.  (Id. at 25-

26.)

Thereafter, an officer drove Stile's ATV somewhere and Cunningham explained that it

was being taken because there were "implements from cultivation of marijuana on it."  (Id. at

26.)  The conversation then returned to the imported cigarettes before Cunningham brought it

back to the matter of the robbery.  (<u>Id.</u> at 27.)  Cunningham stated that Stile had "already claimed [his] right to remain silent" and that Cunningham was "not asking [Stile] a question," only "laying it on the line."  (<u>Id.</u>)  There is language in the transcript to the effect that Cunningham said Stile "did not invite [sic] a blanket right to silence," but this is not to be heard on the audio recording.  (<u>Id.</u> at 28;  Audio Recording #3 at 59:30—1:00:15.)  Cunningham expressed a further desire to learn about the guns and drugs because it would impact Stile's bail if those were not recovered and because of the public safety risk in failing to account for them.  (Transcript #3 at 28.)  Stile merely responded that he had no control over that.  (<u>Id.</u>)  Stile said he understood he was a suspect but that he thought they would find he was not the one.  (<u>Id.</u> at 29.)  Cunningham then questioned whether there was someone else involved and said that Stile would take all the responsibility if he did not identify the person.  (<u>Id.</u> at 30.)

An officer identified as Dave Wilson on the transcript next joined the conversation and Stile talked about a "broad" who was still "stalking" him after nine years.  Stile then asked Cunningham, "When do I get a lawyer, Matt?  Cause I can't afford one."  (<u>Id.</u> at 33;  Audio Recording #3 at 1:08:00.)  Cunningham explained that Stile would have to put in his "indigent" paperwork and to ask at the jail, where they would "hook him up" with "all that stuff." (Transcript #3 at 33.)  Sergeant Knight then appeared and told Stile they wanted him to change his clothes and also see to feeding and watering the dogs before he was taken from the premises. (<u>Id.</u> at 34.)  Knight then walked off and Cunningham discussed with Stile what would become of the dogs.  (<u>Id.</u> at 36-37.)  Nothing of note was said during the remaining minutes of the interview.

In summary, Cunningham and Stile conversed for slightly more than three hours. Although Stile initially suggested that he would exercise his right to remain silent, Stile

eventually queried of Cunningham, after Cunningham has resolved to sit quiet for the duration of

the search, "What do you want to ask me?"  From there, a lengthy conversation ensued.  Stile

never again invoked his rights, though he did obliquely inquire when he could get a lawyer.

Stile's statements did not include a confession of the robbery, though he did acknowledge the

existence of the marijuana on his premises.  In this regard, he did acknowledge that there were

plants, but he did not make any statement concerning the number of plants.

**September 15, 2011, Interview**

On September 15, 2011, Lieutenant Carl Gottardi II of the Somerset County Sheriff's

Office met with Stile at Stile's request.  Gottardi testified at the hearing that this meeting took

place in Gottardi's office.  The audio recording and transcript were admitted in evidence at the

hearing.  (Transcript, Gov't Ex. 11-T;  Audio Recording, Gov't Ex. 11-R (one audio CD).)  I

have reviewed both the audio recording and the transcript.  The transcript accurately captures

what can be heard on the audio recording.  Stile indicated that he would have preferred to talk

with Matt Cunningham, but the interview with Gottardi proceeded in any event.  After some

preliminary remarks, Stile asked if they were being recorded.  Gottardi denied it, though the tape

was running.  (Transcript at 2.)  Gottardi explained that he would have to read Stile his rights and

he did so.  (Id. at 2-3.)  He then offered that Stile could talk to Cunningham, but not at that time

because Cunningham was at court.  (Id. at 4.)  Stile again asked whether they were being

recorded.  Gottardi stated this time that he was recording the conversation, but that he did not

have to tell Stile, in any event.  (Id. at 5.)  Gottardi presented Stile with an accounting of

evidence related to the robbery and an explanation of the drug problem law enforcement has to

deal with these days.  Gottardi also explained the concern that there were drugs and guns lying

about somewhere that could come into the possession of a child.  (Id. at 5-8.)

Gottardi next started to give Stile an update on his dogs and Stile stated that he understood that one of them had died.  (Id. at 9.)  Stile asked for an opportunity to go to his home and have two hours there.  (Id. at 10.)  He related to Gottardi some of his personal history surrounding pain medications, without giving any indication that he was presently undergoing withdrawal symptoms.  Eventually Stile steered the conversation to his request to have some time at home to shower, shave, spend some time with the dogs, and sort out paperwork for the dogs.  He expressed concern that one of his dogs had been killed and stated that his dogs were everything to him.  (Id. at 14.)  Gottardi brought up the subject that there were guns and drugs that were not yet recovered, which presented a problem with Stile's proposal.  (Id. at 15.)  Stile responded that he was offering "terms," an inculpatory-sounding statement.  (Id.)  He later indicated that if he could have a list of needs met he would "cooperate."  (Id. at 17.)  The conversation rambled on and Stile once more asked to be brought to his house, saying he would like to see to his dogs and see that the dead dog was taken care of.  (Id. at 20.)  Gottardi said that it could be arranged and Stile taken out, but that this treatment was for someone who was going to offer something in return.  He said he would speak with the district attorney, but that the trouble would be the outstanding items, meaning the guns and drugs.  (Id. at 20-21.)  He stated that these items would have to be secured in order for Stile's request to be granted.  (Id. at 21.)  Stile offered some statements that could be construed as admissions insofar as he suggested he had something to offer.  (Id. at 23-24.)

This back-and-forth continued to repeat and Stile asserted that time was running out and that his offer was only "good for today."  (Id. at 26.)  Stile offered some additional statements that could be construed as admissions and Gottardi explained that in no event would Stile receive what he was asking for before supplying what law enforcement wanted.  (Id. at 28-29.)  Stile

offered some further statements suggesting he had something to trade and reminded Gottardi of the public safety concern, to which Gottardi said he would make a call and relay the offer but could safely say it was not going to go forward on Stile's terms.  (Id. at 34-36.)  In all, Gottardi spent approximately one hour talking with Stile.

**September 16, 2011, Interview**

Matt Cunningham and Carl Gottardi met again with Stile on September 16.  Two audio recordings and two transcripts were admitted at the hearing.  (Transcripts, Gov't Exs. 12A-R, 12B-R;  Audio Recordings, Gov't Exs. 12A-T, 12B-T.)  Exhibit 12A-R is a recording captured by Cunningham.  Exhibit 12B-R is a recording taken by Gottardi.  My citations are drawn from the transcript of Cunningham's recording, Exhibit 12A-T.

Early in the interview, Stile repeated his request for some time at home and an opportunity to see to his dogs and to tell people what had happened to him.  (Transcript at 1-2.)  Cunningham said he was not going to get anything because he had not been cooperative about the guns and drugs.  (Id. at 2.)  This time, Stile stated they "could have them" if they wanted "to play poker."  (Id. at 3.)  He repeated his concern about his dogs and his desire to inform his family.  (Id.)  He said he was willing to give them what they wanted.  (Id. at 5.)  This pattern repeated with additional incriminating statements being made along the same lines.  There are two things of note.  The first is that Cunningham represented to Stile that, if someone came upon a gun and used it to kill somebody, Stile could share in criminal liability for homicide.  (Id. at 8-9.)  The second is that all of the preceding occurred before Cunningham read Stile his Miranda rights.  (Id. at 9.)

Cunningham eventually advised Stile of his rights.  (Id. at 9.)  Stile persisted in his request to go to his home.  (Id. at 10.)  He suggested that they "wrap it up today."  (Id. at 11.)

Gottardi then joined the conversation and he talked about the dogs and also about why someone would want to take trained German shepherds in a vehicle when going to a pharmacy robbery. (Id. at 12-17.)  Asked by Cunningham to give his worst case scenario of what he thought was going to happen, Stile opined that it looked like he would be going to jail for "quite some time." (Id. at 18.)  The investigators then discussed the fact that Stile's cooperation with recovering the guns and drugs might result in a reduced sentence, but also that they felt comfortable enough with the evidence they already had and that the only reason they were talking to Stile was because of the public safety concern associated with unaccounted for guns and drugs.  (Id. at 18-43.)  Most of the conversation consisted of Gottardi talking, with occasional input from Cunningham.  Stile's responses are generally inaudible or non-responsive, short statements. Eventually, however, he did state that he knew what they wanted and would give it to them if they gave him the opportunity to see to his dogs.  (Id. at 24, 33, 36, 39, 42, 43, 47.)  He also offered statements in the nature of admissions concerning some of the money found on his person.  (Id. at 45-46.)  Near the conclusion of the recording, Cunningham indicated that the reason Stile has been detained in maximum security since his arrest is "because we still got stuff out there."  (Id. at 51.)  Stile indicated that he was denied a phone call and the opportunity to shower during this time.  (Id. at 49.)  A corrections officer can be heard to say that Stile should have had the opportunity to shower during his stay, depending on the day of the week.  (Id. at 51.)  The record does not provide a reliable basis to find that Stile was denied shower privileges.

**Meeting with the Animal Control Officer**

At some point a corrections officer in the jail presented Stile with a couple of pictures of the dog that died and with forms sent an animal control officer that Stile needed to sign to

authorize the cremation of the dog.  Stile testified at the hearing that seeing the pictures of the

dog upset him and made him want to talk to the authorities so he could look after his dogs.

**September 19, 2011, Interview**

The September 19 interview was recorded.  A video recording (Gov't Ex. 13-R) and a

transcript (Gov't Ex. 13-T) were admitted in evidence at the hearing.   The interview began with

a few more minutes of dog-talk that did not amount to interrogation and then Cunningham gave

Stile the <u>Miranda</u> warning.  (<u>Id.</u> at 6-7.)  After the warning, Stile asked whether they could

arrange to have an attorney there.  Cunningham asked whether Stile had filled out the paperwork

to get his attorney and Stile responded that he had.  (<u>Id.</u> at 7.)  Cunningham said it could be

arranged.  (<u>Id.</u>)  Cunningham also stated that Stile need not talk without a lawyer present and

asked whether Stile wished to continue answering questions.  (<u>Id.</u> at 8.)  Stile simply stated,

"Possibly."  (<u>Id.</u>)  From there, Stile complained of being held "incommunicado," about having no

medication to assist with pain, about not being able to sleep, and about "freezing to death."  (<u>Id.</u>

at 9.)  Cunningham observed that Stile should be "detoxed" as of that date.  (<u>Id.</u> at 10.)

Cunningham made another effort to direct the conversation toward the guns and drugs, informing

Stile that "the feds" were going to be taking the case and that it was due to Stile's failure to

cooperate concerning the guns and drugs.  (<u>Id.</u> at 11-12.)   He told Stile that there were not going

to be any deals and that the only offer available was for Stile to give them the information "in the

hopes that it will assist your case."  (<u>Id.</u> at 13.)  Stile stated he was not interested and that the

case against him was only "circumstantial."  (<u>Id.</u> at 14.)  Cunningham said that Stile was

changing his tune because in prior interviews he "essentially stated" that he did the robbery but

that he wanted "to make a deal" before giving them the guns and drugs.  Stile responded that he

merely offered them "a gun," not a gun that was used in the alleged robbery.  (<u>Id.</u> at 15.)  This is

consistent with Stile's testimony at the hearing.  He maintains that he was going to give law enforcement "a gun" in exchange for some time at home.  The balance of the September 19 interview consisted of Stile telling Cunningham about unrelated personal history and another attempt by Cunningham to persuade Stile to turn over the guns and drugs (id. at 15-19), followed by more unproductive discussions related to Stile's personal history, the politics of criminalizing drugs, the art of training dogs, and the nature of different dog breeds.

**The Third Search Warrant**

On September 20, 2011, Lieutenant Gottardi sought and obtained a third search warrant. This warrant authorized a search of Stile's premises and grounds for contraband guns and drugs based, in part, on the fact that Stile had suggested an ability to provide officers with what they wanted if they allowed him some time at home and the fact that Stile had intimated that the contraband items were on or near his property.  (Gov't Ex. 18.)

**September 22, 2011, Interview**

On September 22, Stile was brought in to the Somerset County Sheriff's Office to meet with Brent McSweyn and Cunningham.  A video recording (Gov't Ex. 14-R) and transcript (Gov't Ex. 14-T) were admitted at the hearing.  McSweyn informed Stile that a federal arrest warrant issued and that the matter was being transferred for federal prosecution.  (Transcript at 1.)  McSweyn read Stile his Miranda rights and Stile indicated that he wanted McSweyn to stop because he met with his lawyer about a half an hour ago.  (Id. at 2.)  McSweyn responded that they were through and, although conversation continued for a brief time, it involved Stile requesting information and clarification about the transfer of the case to federal court and where he would be detained pending trial.

### DISCUSSION

Stile seeks the suppression of all statements he made to officers, arguing that they failed to scrupulously honor his assertion of the right to remain silent and that they questioned him in the absence of counsel.  (Motion to Suppress Statements for <u>Miranda</u> and Sixth Amendment Violations at 1-2, ECF No. 94.)  With respect to the presence of counsel, Stile complains that he requested counsel as early as the September 13, 2011, interview at his home and he also indicates that he had his initial appearance in state court on September 14 and requested counsel, but thereafter was questioned in the absence of counsel before counsel was appointed to represent him.  (<u>Id.</u> at 4.)  In a separate motion, Stile seeks the suppression of all statements beginning with the questioning on September 14, 2011, on the ground that the statements were involuntary.  (Motion to Suppress Involuntary Statements at 1, ECF No. 96.)  In this motion, Stile contends that he was overcome by opiate withdrawal, concern for the welfare of his dogs, being held incommunicado at the jail, promises of lenient treatment, and false threats of prosecution, and that the officers manipulated these circumstances to overcome his will to remain silent.  (<u>Id.</u> at 2-3.)  For reasons that follow, a limited subset of the statements Stile made on September 16, 2011, should be suppressed because, although voluntary, they were elicited without the benefit of a fresh <u>Miranda</u> warning.  In the main, however, Stile's statements are admissible at trial because they were warned and Stile "knowingly and intelligently" waived his rights and offered his statements voluntarily.

### A.      Fifth Amendment / <u>Miranda</u> Rights

Stile argues that his statements must be suppressed because of a <u>Miranda</u> violation.  He contends that he asserted his right to remain silent and to have counsel present during questioning.  The Government responds that Stile waived his <u>Miranda</u> rights.  The law requires

that a valid waiver must be voluntary and "knowing and intelligent."  United States v. Bezanson-

Perkins, 390 F.3d 34, 39 (1st Cir. 2004).  Voluntariness will be addressed separately in Section C

of this discussion, after consideration of whether Stile knowingly and intelligently waived his

Miranda rights and his Sixth Amendment right to counsel (Section B).

      In Miranda v. Arizona,  the Supreme Court established "rules of police procedure

applicable to 'custodial interrogation.'"  Oregon v. Mathiason, 429 U.S. 492, 494 (1977).  It held

that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming

from custodial interrogation of the defendant unless it demonstrates the use of procedural

safeguards effective to secure the privilege against self-incrimination."  Miranda, 384 U.S. 436,

444 (1966).  From there, the Court prescribed the classic "Miranda warning," requiring that any

custodial interrogation be preceded with cautionary advice that the suspect has "a right to remain

silent, that any statement he does make may be used as evidence against him, and that he has a

right to the presence of an attorney, either retained or appointed."  Id.  The Miranda warning was

deemed necessary to combat the "'compelling pressures' inherent in custodial police

interrogation" and safeguard the Fifth Amendment.  Dickerson v. United States, 530 U.S. 428,

440 (2000) (quoting Miranda, 384 U.S. at 467).  According to the Court:

> Once warnings have been given, the subsequent procedure is clear.  If the
> individual indicates in any manner, at any time prior to or during questioning, that
> he wishes to remain silent, the interrogation must cease.  At this point he has
> shown that he intends to exercise his Fifth Amendment privilege;  any statement
> taken after the person invokes his privilege cannot be other than the product of
> compulsion, subtle or otherwise.  Without the right to cut off questioning, the
> setting of in-custody interrogation operates on the individual to overcome free
> choice in producing a statement after the privilege has been once invoked.

Miranda, 384 U.S. at 473-74.

      In Michigan v. Mosley, 423 U.S. 96 (1975), the Supreme Court addressed the issue of

whether officers violated Miranda when they questioned a suspect subsequent to his assertion of

the right to remain silent.  The Court observed that the rule of Miranda can justify the suppression of statements "even though the statement may in fact be wholly voluntary."  Id. at 100.  It then observed that Miranda does not indicated "under what circumstances, if any, a resumption of questioning is permissible."  Id. at 101.  Concluding that it would be "absurd" to allow custodial interrogation to continue after a moment's pause, on the one hand, and "irrational" to say that a suspect could never again be questioned once he invoked the right to silence, on the other, the Court concluded that the admissibility of statements obtained under these circumstances depends "on whether [the] 'right to cut off questioning' was 'scrupulously honored.'"  Id. at 103-104.  Under the circumstances in Mosley, the Court held that statements need not be suppressed where questioning stopped following invocation of the right, but resumed two hours later, with a fresh Miranda warning, concerning a different investigation.  Id. at 104-105.  The First Circuit Court of Appeals has addressed the Mosley rule on multiple occasions.

In United States v. Barone, the Court affirmed a trial court decision to suppress statements based on a failure to "scrupulously honor" assertion of the right to remain silent, despite a finding that the statements in question were voluntary.  968 F.2d 1378, 1379, 1383 (1st Cir. 1992).  Identifying the relevant factors as "*inter alia,* the time that elapsed between interrogations, whether fresh warnings were provided, the scope of the second interrogation, and the intensity with which the officers pursued questioning after the suspect asserted the right to silence," the Court observed that "the Mosley test focuses on what the police did, and when, after the suspect exercised his or her right to remain silent."  Id. at 1384.  The Court's decision to affirm the suppression order was based on the officers' repeated efforts to get the suspect to change his mind, a failure to provide new Miranda warnings, application of pressure related to the location of confinement, and the advantage taken of a long delay in arraignment.  Id.

18

In United States v. Andrade, the Court affirmed a decision admitting statements where questioning resumed several hours after assertion of the right to remain silent, the defendant stated that he remembered his rights, there was no repeated effort to reverse the refusal to talk, and there was no "undue pressure" to talk, even though the second round of questioning concerned the same crime. 135 F.3d 104, 106-07 (1st Cir. 1998). Much like Andrade, in United States v. Lugo Guerrero, the Court held that statements were admissible under Mosley where officers immediately stopped questioning after the suspect asserted his right to remain silent, conducted a second interview nearly four hours later, gave defendant a new set of Miranda warnings, and treated defendant well at all times, even though the second interview concerned the same crime. 524 F.3d 5, 12 (1st Cir. 2008).

In United States v. Thongsophaporn, the Court affirmed a decision to admit statements where the suspect himself "initiated further communication of his own free will, without undue coercion or pressure" and received a new Miranda warning in connection with questioning. 503 F.3d 51, 56 (1st Cir. 2007) (collecting cases). The pause between the assertion of the right to remain silent and the resumption of questioning was not specified in the Thongsophaporn opinion, but the opinion reflects that it was not of significant duration. Id. at 56.

Included in the Miranda warning is the cautionary statement that an accused need not speak to officers outside the presence of an attorney. Miranda, 384 U.S. at 444, 479; see also Edwards v. Arizona, 451 U.S. 477, 481-82 (1981). In Edwards, the Supreme Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U.S. at 484. The Court further held that "an accused . . . , having expressed his desire to deal with the

police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85.  In other words, "it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." Id. at 485.  However, when the accused initiates a meeting and volunteers statements, they may be used against him at trial so long as they were voluntary statements. Id. at 485-86.  To the extent that statements are elicited through interrogation at such a meeting, the question is "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." Id. at 486 n.9.  Also relevant are "the background, experience, and conduct of the accused." Oregon v. Bradshaw, 462 U.S. 1039, 1046 (1983) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).[2]  This analysis, of course, depends on a finding that the accused actually asserted his right to counsel.

In United States v. Ortiz, the First Circuit Court of Appeals vacated a conviction where the defendant's statements were admitted at trial despite being obtained through further police-initiated interrogation after the defendant requested the presence of counsel.  177 F.3d 108, 110 (1st Cir. 1999).  By comparison, in United States v. Conley, the Court affirmed a conviction where the officers refrained from questioning the defendant when he made an "elliptical" statement that he might want an attorney but then inquired "what's this all about?"  156 F.3d 78,

---

[2]       In Bradshaw, the Supreme Court elaborated that the purpose of the Edwards rule was "to protect an accused in police custody from being badgered by police officers," 462 U.S. at 1044, explaining that the accused in Edwards was questioned by police on their initiative the day after invoking his right to counsel and that the police told the accused that he "had to" talk to them, id. at 1043.

83 (1st Cir. 1998).  The accused volunteered incriminating remarks in response to an officer's recitation of the evidence against him and this was held not to violate the Edwards rule.  Id.

With these precedents in mind, the Court must consider the interviews that transpired in this case.  To be admissible, Stile's statements must have been not only voluntary, but also the product of a "knowing and intelligent" waiver.  Bezanson-Perkins, 390 F.3d at 39.  "A waiver is knowing and intelligent when 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  Id. (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  The Court must consider the totality of the circumstances related to the interrogation when assessing whether a defendant knowingly and intelligently waived his rights.  Id. at 40.  As discussed below, there was a window at the start of the September 16, 2011, interview in which Deputy Cunningham interrogated Stile prior to supplying a fresh Miranda warning.  Stile's statements within this window, including his statement about "playing poker," should be suppressed under the rule of Miranda because they were unwarned statements elicited through interrogation or its equivalent.  However, with respect to the balance of his statements, Stile was warned and knowingly and intelligently waived his right to forego questioning or to have counsel present during questioning.

### 1.    September 13, 2011, interview

It is undisputed that Deputy Cunningham provided Stile with a complete Miranda warning at the outset of his extended conversation with Stile on the date of arrest.  Stile did indicate that he "thought he'd better" remain silent upon being warned and that he did not wish to answer any questions.  Cunningham, appropriately, did not proceed to question Stile and responded, "OK, fair enough."  Stile then reinitiated a discussion himself, offering that it would depend on what Cunningham asked.  When Cunningham told him he could not have it both ways

and offered to read him his rights once more, Stile said, "save it," and indicated that he understood his rights.  On this record, there can be little question but that Stile was in charge of the decision whether he would speak with Cunningham.  He clearly did not cut off questioning and instead invited questioning by saying, "Ask, and if I'm gonna answer, I'm gonna answer.  If I'm not, I'm not.  I have no problem.  You're a gentleman.  We're two human beings.  Go for it."  The fact that Stile was exercising control over whether he would answer any questions is further demonstrated by his repeated disregard for or dismissal of questions Cunningham raised about the robbery and recommendations Cunningham made about the benefit of cooperating with law enforcement.  Although Cunningham and McSweyn directed some pointed questions at Stile and pressured him to a degree to cooperate by presenting him with the gradually mounting evidence of his involvement in the robbery, they clearly warned Stile fully of his Miranda rights and treated him fairly and politely.  These factors coupled with Stile's invitation to ask questions demonstrate that Stile's right to determine whether he would speak was scrupulously honored at this interview and that Stile knowingly and intelligently waived his right to forego questioning.

Stile emphasizes a remark made by Cunningham late in the interview, when Cunningham said Stile had already claimed his right to remain silent and that Cunningham was not asking a question but just "laying it on the line."  Stile is correct that Cunningham's discourse with him qualified as "interrogation" in the sense that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  However, Stile is incorrect to suggest that Cunningham's subjective characterization of whether Stile had asserted his rights under Miranda is determinative of the question at hand.  Stile did indicate early on that he thought he should

remain silent concerning the robbery investigation, but he then promptly indicated that he would selectively waive his rights depending on whether he wanted to answer a question or not.  The subsequent interrogation honored <u>Miranda</u> precisely because Stile was fully advised of his rights and Stile thereafter invited questions and retained control of whether and to whom he would speak.[3]

As for the right to have counsel present during interrogation, Stile did not assert this right.  Late in the interview, Stile did ask Cunningham when he would get a lawyer, because he could not afford one.  This was not an assertion of the right to forego any questioning without a lawyer present.  This is particularly apparent from the fact that Stile had previously engaged in an extended discussion with Cunningham after indicating that Cunningham could ask what he wanted and that Stile would only respond to the questions he wanted.  Moreover, it would have been apparent to Stile that the search of his premises was wrapping up and that he was about to be transported elsewhere.  In this context, Stile was simply inquiring when he would have a lawyer.  He was not asserting a right to avoid any further questioning.

Finally, Stile dug in his heels a bit when Cunningham indicated that he needed to take a DNA sample using a cheek swab.  Stile stated that he thought he would want to talk to a lawyer about it before allowing them to take any of his bodily fluids.  This was not an assertion of Stile's right to have counsel present during questioning.  It is apparent from the context of the statement that Stile was merely seeking to forestall the collection of DNA evidence.  He did not assert his right to cut off questioning in the absence of counsel.

---

[3]      Stile did not confess his participation in the robbery in response to any questioning or its functional equivalent.  Stile did acknowledge his marijuana grow operation in the face of incontrovertible proof that he was growing marijuana in his home.

### 2. September 15, 2011, interview

The record reflects that on September 15, 2011, Stile requested a meeting to present an offer, or "terms" that might enable him to spend a few hours at home, in part to see to his dogs. Lieutenant Gottardi supplied a fresh _Miranda_ warning to Stile and Stile's entreaty reflected that he was choosing to speak with Gottardi. To be sure, Gottardi sought to use the opportunity to elicit a confession, and he did gain an offer from Stile to "cooperate" if certain terms were met, but two days had passed since the arrest, a fresh warning was supplied, and Stile himself sought out the opportunity to present his "terms." On these facts there was no violation of the right to remain silent.

Stile emphasizes that Gottardi lied to him about whether the meeting was being recorded. The record reflects that Gottardi initially misrepresented that the meeting was not being recorded, but shortly thereafter (before any interrogation) he corrected his statement and told Stile that it was being recorded. A reasonable person in Stile's position would have understood that he was being recorded. Even if Gottardi's initial misrepresentation is a factor worth considering in the totality of the circumstances, it is not weighty enough to override all of the factors demonstrating that _Miranda_ was honored.

As for the right to have counsel present, Stile did not assert this right even after being advised of it. According to Stile's motion, his initial appearance was on September 14, 2011, and he requested the appointment of counsel. However, he did not have counsel as of September 15 and he did not express an unwillingness to talk to officers outside the presence of counsel. Indeed, Stile himself desired a meeting with someone who might agree to his terms for cooperation. Having never asserted his right to have counsel present during custodial interrogation, there was no violation of the Fifth Amendment or _Miranda_ on these facts. Stile's

waiver of his right to remain silent and his right to have counsel present during questioning was knowing and intelligent.

### 3.    *September 16, 2011, interview*

Matt Cunningham and Carl Gottardi met with Stile on September 16, once more on Stile's request.  Before Gottardi participated in the meeting, Stile offered certain statements in response to assertions from Cunningham that qualify as "interrogation" before Cunningham provided Stile with a renewed Miranda warning.  Viewed objectively, Cunningham's statement to Stile that he was not "gonna get anything . . . because you've not been cooperative with us in our investigation [and] failed to tell us where the drugs and money are," coupled with a statement that there could be no deal making without that (Sept. 16, 2011, Interview Transcript at 2), was something Cunningham should have known was reasonably likely to elicit an incriminating response.  Innis, 446 U.S. at 301.  Of course, following his receipt of the warning, the conversation continued on the exact same trajectory that it started on.  Nevertheless, Stile's statements inside of this window should be suppressed because they were elicited through unwarned custodial interrogation.

As for Stile's post-warning statements, Stile knowingly and intelligently waived his right to silence.  Stile had a particular concern over the wellbeing of his dogs and could not personally attend to their needs from prison, though he wished to.  Stile had a personal motivation to engage with the officers and it would defy credulity to find that the giving or withholding of the Miranda warning at the outset of this interview was somehow a determinative factor that caused Stile to make inculpatory statements after he received the warning.  Stile had pursued exactly the same course on September 15 with Gottardi, despite his receipt of the Miranda warning.  This was not a scenario like in Missouri v. Seibert, 542 U.S. 600 (2004), because Cunningham did not

deliberately violate <u>Miranda</u> in order to set the stage for securing incriminating statements in a later, warned interrogation.  Instead, Stile made voluntary statements to Cunningham following a warning, fully aware of the fact that he did not need to do so and that he was running a risk by doing so.  Cunningham's technical violation of <u>Miranda</u> at the outset of the September 16 interview does not call for the suppression of Stile's later warned, voluntary statements.  <u>Oregon v. Elstad</u>, 470 U.S. 298, 318 (1985).  The voluntariness analysis will be elaborated on later, but in summary Stile was in control of his faculties on September 16, made a calculated decision to pursue "terms" with the officers, thinking he might be allowed an opportunity to see his dogs and attend to their needs, and was fully aware of his rights having been warned repeatedly of his rights as of his receipt of the warning on September 16 and having repeatedly acknowledged that he understood them.  Given the totality of the circumstances, it is plain that Stile understood his rights and was in charge of the decision whether and to whom he would speak.

### 4.    *September 19, 2011, interview*

This interview was preceded by the <u>Miranda</u> warning.  Unlike prior conversations, Cunningham clearly indicated to Stile that there would be no deal involving a return to his home.  Stile did ask whether it would be possible to have counsel present for the meeting, but he did not state that he did not want to continue talking in the absence of counsel.  The <u>Edwards</u> rule is not triggered by such "ambiguous or equivocal" inquiries.  <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994).  A reasonable officer in Cunningham's position "would have understood only that the suspect *might* be invoking the right to counsel," and consequently "the cessation of questioning" was not required.  <u>Id.</u> (citing <u>Edwards</u>, 451 U.S. at 485, and quoting it with emphasis for the point that its rule is triggered only when one "has *clearly asserted* his right to counsel").  Cunningham specifically asked Stile if it was his intention to discontinue the conversation and

Stile merely said "possibly."  From there, Cunningham continued to talk with Stile, but the conversation digressed into topics unrelated to the investigation.  I am unable to discern a Miranda violation in this exchange.

**5.    September 22, 2011, interview**

This final interview was warned and terminated shortly after it began when Stile indicated that he currently had a lawyer.  There are no statements associated with this interview that could be the subject of a suppression order.

**6.    Summation**

This particular line of inquiry is premised on Stile's assertions that he asserted his rights to remain silent or to have counsel present during interrogation.  Although Stile expressed an inclination to remain silent on the day of his arrest, he promptly initiated a dialogue that indicated his willingness to entertain questions and to exercise his right selectively;  that is, to speak or not depending on the question presented to him.  With the exception of some dialogue at the outset of the September 16 interview, the officers honored Stile's right to forego custodial interrogation if he so chose following receipt of a Miranda warning.  Not until September 22, 2011, did Stile assert his right to remain silent and he did so through an assertion of his right to avoid questioning outside the presence of counsel.  When he did so, his request was honored. Thus, with the exception of statements elicited by Cunningham on September 16, 2011, prior to giving Stile the Miranda warning on that day, Stile's statements are admissible under Miranda and it progeny.

**B.    The Sixth Amendment Right to Counsel**

In addition to the Fifth Amendment rights protected by Miranda, Mosley, and Edwards, the accused has the right under the Sixth Amendment to have counsel present during all critical

stages of criminal judicial proceedings, including during interrogation that occurs after the initiation of the judicial process. Montejo v. Louisiana, 556 U.S. 778, 786 (2009) (citing United States v. Wade, 338 U.S. 218, 227-28 (1967); Massiah v. United States, 377 U.S. 201, 205-205 (1964); Powell v. Alabama, 287 U.S. 45, 57 (1932)). However, this right may be waived if the "relinquishment of the right is voluntary, knowing, and intelligent." Id. "[T]he decision to waive need not itself be counseled." Id. "And when a defendant is read his Miranda rights . . . and agrees to waive those rights, that typically does the trick, even though the Miranda rights . . . have their source in the *Fifth* Amendment." Id. (citing Patterson v. Illinois, 487 U.S. 285, 296 (1988)). The central holding of Montejo is precisely that there is no presumption of involuntariness attached to statements made to officers in the context of custodial interrogation after the appointment of counsel, let alone after a mere request for the appointment of counsel. Id. at 797 (plurality opinion) (overruling Michigan v. Jackson, 475 U.S. 625 (1986)). As for the test to be applied, "doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver." Id. at 795. "What matters . . . is what happens when the defendant is approached for interrogation, and (if he consents) what happens during the interrogation—not what happened at any preliminary hearing." Id. at 797.

As discussed in the Fifth Amendment/Miranda context, Stile never asserted his right to have counsel present during questioning and he invited further questioning by the manner in which he responded to the reading of his Miranda rights. Until the final interview of September 22, 2011, Stile's conduct and words reflected a knowing and intelligent waiver of his Sixth Amendment right to counsel. When he finally asserted his Sixth Amendment right to counsel, questioning stopped.

C.     **Voluntariness**

Apart from demonstrating that the officers honored Stile's Fifth and Sixth Amendment rights related to custodial interrogation, there is a burden on the government to prove that the defendant's statements were voluntary by a preponderance of the evidence.  Lego v. Twomey, 404 U.S. 477, 489 (1972).  The government must show that, based on the totality of the circumstances, the investigating agents neither "broke" nor overbore the defendant's will, Chambers v. Florida, 309 U.S. 227, 240 (1940), and that his statements were "the product of a rational intellect and a free will," Blackburn v. Alabama, 361 U.S. 199, 208 (1960).  See also Lynumn v. Illinois, 372 U.S. 528, 534 (1963).  As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'."  Colorado v. Connelly, 479 U.S. 157, 167 (1986).  Coercive police activity may include either the creation of a susceptible psychological state in the person interrogated, Townsend v. Sain, 372 U.S. 293, 307-308 (1963) (concerning alleged administration of a "truth serum" to quell a heroin addict's withdrawal symptoms), or the exploitation of an existing psychological condition, Blackburn, 361 U.S. at 207-208 ("[A] most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane.")

> When charged with determining whether a confession was voluntary, an inquiring court must sift through the totality of the circumstances, including both the nature of the police activity and the defendant's situation.  Relevant considerations may include the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities) imposed upon the suspect.  They also may include an appraisal of the defendant's attributes, such as his age, education, intelligence, and mental state.  In short, an inquiring court must conduct the juridical equivalent of an archeological dig into the whole of the circumstances.

United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011).

Stile says that the officers took advantage of his weakened psychological state by questioning him during a period of drug withdrawal and a period of serious distress related to the wellbeing of Stile's dogs, which he says meant everything to him.  I have exhaustively reviewed recordings of the custodial interviews conducted on September 15 and thereafter and have had an opportunity to assess Stile's credibility and demeanor on the witness stand.  With respect to the recorded interviews, I observed no evidence of irrational thought or of an unduly susceptible psychological state caused by the alleged withdrawal symptoms.  If Stile was, in fact, going through a withdrawal process, his symptoms were mild and did not overcome his ability to exercise a rational intellect and free will.  Stile possessed at least ordinary intelligence, if not greater than average intelligence.  He is a mature adult who has had past dealings with law enforcement.  He is someone who harbors a deep skepticism of law enforcement based on his prior experiences and was certainly no pushover in his dealings with the officers.  Stile demonstrated greater than average resilience in the presence of law enforcement.  There is no doubt in my mind that he understood his rights but made a calculated decision to pursue his "terms," possibly in recognition of the fact that the circumstantial evidence against him was considerable.

Stile also contends that the officers took unfair advantage of his emotional upset in relation to his dogs.  Stile's concern for the wellbeing of his animals is commendable and understandable, but it is certainly of no greater significance than the concern that many accused have in relation to dependent family members.  The evidence does not demonstrate abusive treatment of Stile of the kind that takes advantage of a known psychological infirmity.  Deputy Cunningham communicated to Stile as best as he could what was happening in relation to Stile's dogs.  He did not present Stile with pictures of the deceased dog in the context of an

interrogation.  Rather, the pictures were presented to Stile at the jail in connection with efforts to have him sign off on the dog's cremation.  Although the pictures of the deceased dog may have particularly upset Stile, he certainly wanted to be informed and there was no cause to shield him from the truth in the fear that it would somehow be construed as badgering him to confess. Moreover, there is no evidence indicating that Cunningham or Gottardi played any role in the decision to present photographs to Stile.  By all appearances, that occurred without any of their involvement.  Nor was there any threat or suggestion by the officers that Stile's dogs would suffer or be mistreated in the absence of cooperation.  To the contrary, the officers indicated that people were seeing to the animals' care.  A reasonable person's will to withhold statements would not be overborne by such news or by pictures of a deceased dog.[4]  And while it is true that the officers recognized in the dog issue something that would get Stile talking and were fully willing to entertain Stile's negotiations in order to gather evidence, Stile himself desired these meetings to press his "terms" and he understood that he was hazarding his rights by doing so.

Stile also complains because he was encouraged to cooperate with assertions that it could better his situation in the context of bail and sentencing and would prevent a public safety hazard that could end poorly for Stile, if someone discovered and then used either a gun or the drugs. These representations are relevant to the voluntariness inquiry, but they did not amount to coercion and did not overwhelm Stile's ability to exercise a free will.

Finally, Stile would contend that he suffered coercion based on all of the foregoing coupled with the conditions of his confinement, including being held "incommunicado" in the prison.  Cunningham can be heard to say at the end of the September 16, 2011, interview that Stile was being held in maximum security because of the unaccounted for items, so it is apparent

---

[4]     The record reflects that one of Stile's dogs attempted to jump a fence and was hanged by her own collar. Other dogs in the fenced in area evidently clawed at her hindquarters while she was suspended, possibly in an effort to release her.

that the Somerset County Sheriff's Office was mindful of the possibility that sequestering Stile could make him more likely to talk.  However, while this is certainly a factor to weigh in the totality of the circumstances, my assessment of Stile is that his will was not overborne by coercive treatment.  The mere fact that Stile was held in "maximum security" does not demonstrate that his statements were involuntary.  Indeed, it is difficult even to understand what "incommunicado" means in this context, as it is based on nothing more than a conclusory assertion and lacks any real factual development.  Stile was taken to his initial appearance in a timely fashion.  There is no evidence indicating that anyone sought to visit Stile between September 13 and September 22.  Nor is there any indication of how an inability to contact any particular person imposed a special hardship on Stile, other than in relation to his desire to make arrangements for his dogs.  On this topic, Cunningham asked Stile to provide him with contact information for anyone Stile thought would be of assistance.  Other than providing the name of one woman who could assist—and who was contacted by authorities—Stile was not forthcoming with contact information for others who could be of assistance in this regard.  Stile also took the witness stand at the suppression hearing and his testimony did not suggest any mistreatment in the jail setting.  As for the treatment Stile received during interrogation, the officers treated Stile politely and reasonably.  There was no badgering or mistreatment.  The totality of the circumstances demonstrates that Stile was not coerced into making statements.

## CONCLUSION

For the reasons set forth above, I recommend that the Court GRANT IN PART the defendant's motion to suppress statements for Miranda violations (ECF No. 94), and suppress statements made by Stile during the September 16, 2011, interview up until his receipt of the Miranda warning.  In all other respects, I recommend that the Court DENY the motion.  I further

recommend that the Court DENY the defendant's motion to suppress statements as involuntary

(ECF No. 96).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

January 16, 2013