UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | 1:11-cr-00185-JAW |
| | ) | |
| JAMES STILE | ) | |

**ORDER ON MOTION TO DISMISS INDICTMENT AND STAY PROCEEDINGS PENDING RECONSTITUTING JURY WHEEL TO CONFORM TO STATUTORY AND CONSTITUTIONAL FAIR CROSS SECTION REQUIREMENTS**

James Stile moves to dismiss the indictment and to stay proceedings on the theory that the District's jury plan and its implementation of that plan failed to produce a grand jury consistent with statutory and constitutional fair cross-section requirements. The Court denies the motion, concluding that generational groupings do not constitute a "distinctive group in the community" for purposes of the fair cross-section requirement, and that any implementation failures were merely technical.

**I. PROCEDURAL BACKGROUND**

   **A. Indictment and Scheduled Trial**

On October 20, 2011, a federal grand jury indicted James Stile for four violations of federal law: (1) robbery of controlled substances from a DEA Registered Pharmacy, an alleged violation of 18 U.S.C. § 2118(a), (2) use of a firearm in furtherance of a federal crime of violence, an alleged violation of 18 U.S.C. § 924(c)(1)(A), (3) being a felon in possession of a firearm, an alleged violation of 18 U.S.C. § 922(g)(1), and (4) manufacturing more than 100 marijuana plants, an alleged

violation of 21 U.S.C. § 841(a)(1).  *Indictment* (ECF No. 8).  On July 15, 2014, the Court set this case for trial in November 2014 and the matter now stands ready for jury selection and the commencement of trial on November 3, 2014.[1]  *Notice of Hr'g* (ECF No. 432); *Notice of Rescheduled Hr'g* (ECF No. 471).

**B.    Jury Records**

In February 2014, Mr. Stile revealed that he intended to challenge the composition of the grand jury that indicted him.  Over the ensuing months, Mr. Stile made various requests from the Clerk's Office for juror information and, in the end, was satisfied with the information the Clerk's Office had provided.  *Order on Status of Mots. for Disclosure of Jury Records* (ECF No. 479).  The records that form the underlying basis for the motion include the following:

1) United States District Court for the District of Maine Plan for the Random Selection of Grand and Petit Jurors for Service in the District of Maine dated December 16, 2008;

2) The Master Wheel;

3) The Qualified Wheel Report;

4) Letter dated February 16, 2012 from Judge Woodcock to a grand juror excusing that grand juror for cause;

5) AO Form 12 dated December 22, 2010, entitled Report on Operation of the Jury Selection Plan Completed Pursuant to 28 U.S.C. § 1863(a);

---

[1]    On July 17, 2014, the Court granted Mr. Stile's motion for relief from prejudicial joinder.  *Order on Def.'s Mot. for Recons. of Mot. for Relief from Prejudicial Joinder* (ECF No. 434).  The first three counts are likely to be tried first together and the fourth count—the marijuana count—is likely to be tried later.

2

6) A CD entitled Juror Records;

7) A CD entitled Additional Data Request—Census Tables.

## II. THE PARTIES' POSITIONS

### A. James Stile's Motion

On October 3, 2014, James Stile moved to dismiss the indictment in this case claiming that the District of Maine juror selection process violates both statutory and constitutional requirements that the jury be representative of a fair cross-section of the community. *Mot. to Dismiss Indictment and Stay Proceedings Pending Reconstituting Jury Wheel to Conform to Statutory and Constitutional Fair Cross Section Requirements* (ECF No. 476) (*Def.'s Mot.*). Mr. Stile engaged the services of Jeffrey O'Neal Martin, an economist and statistical expert, to analyze the District of Maine's Plan and its application to James Stile's case. *Def.'s Mot.* Attach. 1 (*Martin Decl.*). In his motion, Mr. Stile raises four overriding points: (1) that the Clerk's Office failed to properly follow up when questionnaires contained obviously erroneous information or undelivered questionnaires; (2) that the Jury Plan violates the fair cross-section requirement of the United States Constitution by allowing prospective jurors over the age of 70 to opt out; (3) that the Jury Plan violates 28 U.S.C. § 1863(a)

by failing to have an Oversight Panel;[2] and (4) that the Jury Plan violates 28 U.S.C. § 1863(b)(2) because it is drawn exclusively from voter registration lists.[3] *Id.* at 2-5.

---

[2] In his motion, Mr. Stile claims that there was no "oversight panel" for the District of Maine Plan. *Def.'s Mot.* at 5 (citing 28 U.S.C. § 1863(a)). He asserts that the absence of an oversight panel in the District of Maine constituted "a substantial violation of the statute in that there was no oversight of the Clerk's performance of the obligations pursuant to the 2008 July Plan." *Id.*

Mr. Stile must be referring to 28 U.S.C. § 1863(a), which reads in part: "The plan shall be placed into operation after approval by a reviewing panel consisting of the members of the judicial council of the circuit and either the chief judge of the district whose plan is being reviewed or such other active district judge of that district as the chief judge of the district may designate." There is no evidence that the First Circuit Judicial Council did not approve the 2008 Jury Plan for the District of Maine and the Court understands that the Judicial Council did in fact approve the 2008 Plan.

In addition, Mr. Stile asserts that it was "[n]ot until the 2012 amendment to the Jury Plan" that an "Oversight Panel [was] added." *Def.'s Mot.* at 5. But the 2008 Plan makes express reference to the "Reviewing Panel prescribed by 28 U.S.C. § 1863(a)." Plan *at* 1. The 2012 Plan contains the same language. The Court is unclear why Mr. Stile believes that the 2012 Plan changed provisions with respect to the reviewing panel.

Most significantly, Mr. Stile misapprehends the role of the reviewing panel. The statute imposes an obligation on each district to "devise and place into operation a written plan for random selection of grand and petit jurors." 28 U.S.C. § 1863(a). The plan is subject to approval by the reviewing panel. *Id.* But once approved, the statute charges the district court, not the reviewing panel, with "plac[ing the Plan] into operation." *Id.* The reviewing panel is not an oversight panel as Mr. Stile contemplates.

The Court has not considered these unsupported contentions.

[3] In his motion, Mr. Stile makes the unsupported assertion that "the lack of other source lists results in the systematic exclusion of a large segment of the population, to wit, the Millennial generation, and African Americans, as well as Native Americans." *Def.'s Mot.* at 5. Native Americans and African-Americans are obviously legally "distinctive" groups in the community. *Royal*, 174 F.3d at 6 ("blacks are unquestionably a 'distinctive' group for the purposes of a fair cross-section analysis"); *United States v. Clifford*, 640 F.2d 150 (8th Cir. 1981) (applying the Supreme Court's analysis in *Duren v. Missouri*, 439 U.S. 357 (1979), to Native Americans).

But Mr. Stile's single sentence argument on these groups is wholly undeveloped. Moreover, Mr. Martin's statistics do not support this assertion. Mr. Martin states that the "jury eligible population for the Eastern Division is 0.83% American Indian/Alaska Native" and "0.40% African-American." *Martin Decl. at* 5. He states that the percentages on the qualified jury wheel were 0.50% American Indian/Alaska Native" and "0.25% African-American". *Id.* Nowhere does Mr. Martin assert that these tiny variations in percentage are statistically significant and other than saying it is so, Mr. Stile failed to present any further argument. The Court has not considered the argument concerning either group.

Similarly, Mr. Stile makes the blanket statement that "the use of only voter registration lists, instead of motor vehicle lists or resident lists, results in the exclusion of the Millennial generation, another example of systematic exclusion." *Def.'s Mot.* at 10. But, there is nothing in the record supporting this assertion. For example, there is no evidence what impact, if any, supplementation of the Jury Plan's voter registration lists by the use of these additional sources would have on the fair cross-section requirement. Again, the Court has not considered this undeveloped argument. However, even if Mr. Stile had adequately supported his assertion, his overall argument is still unsuccessful because the Millennial generation has not been determined to be a "distinctive group" under First Circuit law. *See infra* Part III(A).

### B. The Government's Response

On October 10, 2014, the Government filed its opposition to Mr. Stile's motion. *Opp'n to Def.'s Mot. to Dismiss Indictment and Stay Proceedings Pending Reconstitution of Jury Wheel* (ECF No. 489) (*Gov't's Opp'n*). The Government argues that Mr. Stile has failed to establish a prima facie case of unconstitutional disproportionality and has not shown a failure on the part of the Clerk's Office to comply with the Jury Selection and Service Act (JSSA) that implicates his right to a grand jury composed of a fair cross-section of the community. *Id.* at 1. The Government says that even if the Clerk's Office erred in not following up obvious errors in the Qualified Wheel, the errors were technical only and did not constitute a substantial failure to comply with the JSSA. *Id.* at 3-4. Regarding Mr. Stile's contention that the District violated the fair cross-section requirement, the Government disagrees with Mr. Stile's premise that to allow jurors over the age of 70 to opt out affected a distinctive group under the law. *Id.* at 5-7.[4]

## III. FACTUAL BACKGROUND

### A. The District's Plan for Random Selection

The JSSA directs each district court to "devise and place into operation a written plan for random selection of grand and petit jurors" in accordance with the statute's requirements. 28 U.S.C. § 1863(a). Pursuant to that directive, on December 16, 2008, this District adopted a Plan for the Random Selection of Grand and Petit

---

[4] The Court allowed Mr. Stile seven days from the date of the filing of the Government's opposition to file a reply. *Tr. of Proceedings* 12:21-13-3 (ECF No. 498).

Jurors for Service in the District of Maine (Plan). *Order Dismissing Without Prejudice Mot. to Dismiss Indictment* Attach. 1 (ECF No. 381) (*Plan*).

### 1. The Master Wheel

The Plan requires the Clerk to maintain a so-called master jury wheel for the District of Maine. *Id.* at 3. To obtain the names and addresses of people on the master wheel, the Plan directs the Clerk to use the Central Voter Registration System maintained by the state of Maine as the source for obtaining potential jurors. *Id.* The Plan contemplates that the master wheel will be emptied and refilled once every four years within nine months following a general election for President of the United States. *Id.* at 4. The Plan mandates that the minimum number of names shall be one-half of 1% of the total number of names in the Central Voter Registration System and, if necessary, the Court may order additional names placed in the master wheel. *Id.* To compose a grand jury in Bangor, the names of prospective jurors must be selected at random from the Central Voter Registration System from the counties of Aroostook, Franklin, Hancock, Kennebec, Penobscot, Piscataquis, Somerset, Waldo, and Washington. *Id.* Once the Clerk receives a list of names from the state of Maine Secretary of State, the Clerk uses a properly programmed electronic data processing system to randomly select names for the master wheel. *Id.* at 5.

### 2. The Qualified Jury Wheel

From the master wheel, the list of potential jurors is narrowed to what is called the qualified jury wheel. *Id.* at 6. The Plan authorizes the use of the Jury Management System (JMS), an electronic data processing system, to select names

from the master wheel to fill the qualified jury wheel. *Id.* at 3. The Plan provides that the Clerk shall use the JMS to randomly draw a sufficient number of names from the master jury wheel to maintain an adequate number of names in the qualified jury wheel to meet the needs of the District. *Id.* at 6. The Clerk posts annually in Bangor a general notice of the approximate times of the drawing of the names from the master and qualified jury wheels. *Id.* The actual number of jurors constituting the qualified wheel depends on the needs of the District; however, the Plan provides that the number shall be not less than 500 qualified persons in Bangor. *Id.*

Once the potential names for the qualified jury wheel are selected, the Clerk mails to each person a juror qualification questionnaire form with instructions to execute and return the completed form, duly signed and sworn to, within ten days. *Id.* The Plan has provisions for individuals unable to complete the form. *Id.* at 6-7. The Plan also provides:

> In any case in which it appears that there is an omission, ambiguity, or error on a form, the Clerk shall return the form with instructions to the person to make such additions or corrections as may be necessary and to return the form to the Clerk within ten days.

*Id.* at 7. It allows the Clerk's Office to use a commercial mailing service, the U.S. Postal Service, or the U.S. Marshal to assure that the questionnaires are delivered. *Id.* at 7. If a person fails to return a completed questionnaire, the Plan authorizes the Clerk to pursue the matter in accordance with 28 U.S.C. § 1864(a). *Id.* Section 1864(a) of title 28 allows the Clerk to summon a person who fails to complete the form as instructed.

### 3. Qualifications and Exemptions

The Plan has several qualifications for jury service, including—for example—that the person must be a citizen of the United States. *Plan* at 8. Mr. Stile's motion raises no issues with the Plan's list of qualifications for service on the grand jury. *Def.'s Mot.* at 1-11.

The Plan also sets forth a number of exemptions: (1) members in active service in the Armed Forces of the United States; (2) members of fire or police departments in any state, district, territory, possession, or subdivision thereof, and (3) public officials in the executive, legislative, or judicial branches of the United States, or any state, district, territory, possession or subdivision thereof, who are actively engaged in the performance of official duties. *Plan* at 8-9. Mr. Stile's motion raises no issues with the Plan's list of exemptions. *Def.'s Mot.* at 1-11.

Also, the Plan provides for certain categories of individuals who may be permanently excused from jury service; these include (1) all persons over seventy years old; (2) all actively engaged attorneys, physicians, surgeons, and dentists, (3) all persons who have served as jurors in state or federal court within the preceding two years, (3) all persons who serve without compensation as firefighters, members of a rescue squad or ambulance crew for a public agency, (4) all persons who have active care and custody of a child under ten whose health or safety could be jeopardized by the person's jury service, (5) all persons who provide essential care to an aged or infirm person, and (6) all persons whose services are essential to the operation of a business, commercial or agricultural enterprise. *Plan* at 11-12.

Finally, the Plan allows a temporary excuse for a person who demonstrates that jury service would present an undue hardship or extreme inconvenience. *Id.* at 11.

**B.     Jeffrey O'Neal Martin, The Plan, and James Stile**

Mr. Martin identifies as "statistically significant" the "near exclusion" of persons over seventy years of age. *Id.* at 2. He notes that "[w]hile persons over age seventy make up 12.68% of the Bangor Division, they make up 2.58% of the Qualified Jury Wheel." *Id.* He states that this difference "represents an absolute disparity underrepresentation of 10.10% and a comparative disparity underrepresentation of 79.67% meaning that over three quarters of the group is missing." *Id.*

Mr. Martin points out that "almost a third of the summons" were either not delivered or not responded to. *Id.* at 2-3. In the Bangor Division, 17.12% were returned as undeliverable and 15.65% were apparently delivered but not answered. *Id.*

In addition, Mr. Martin says that some of the juror questionnaires were incomplete or inaccurate: two did not fill in the year of birth, 204 listed the birth year as 1800, 11 had years of birth before 1896, a total of 2.02% of the Master Jury Wheel. *Id.* at 4. He notes that twenty-two people who did not qualify based on birthdate were excused as being over 70. *Id.*

Mr. Martin divides potential jurors into discrete generations: (1) the Millennial Generation (those born before 2000 and are also over 18), Generation X (born in 1965 through 1980), Baby Boomers (1946 through 1964), and the Silent Generation (before

9

1946). *Id.* at 6. He says that U.S. Census data for the 2010 decennial census (figures that include non-U.S. citizens) divide up the generations in the Bangor Division as follows: Millenials (15.27%), Gen X (24.75%), Baby Boomers (38.54%), and the Silent Generation (21.45%). *Id.* He says that 59.12% of the Silent Generation is made up of persons 70 or older. *Id.*

The same generational analysis applied to the qualified jury wheel reveals, according to Mr. Martin: Millenials (11.42%), Gen X (28.24%), Baby Boomers (48.98%), and the Silent Generation (11.36%). *Id.* He states that 2.58% of the qualified jury wheel is made up of persons 70 or older. *Id.* He concludes that the absolute disparity between the percentage of persons 70 or older in the Bangor Division of 12.68% and the percentage on the qualified wheel of 2.58% is 10.10%. *Id.* at 7. Applying standard deviation analysis techniques to these statistics, Mr. Martin opines that the underrepresentation of persons seventy or older on the qualified jury wheel is "not the result of random factors or luck, but is the result of a systematic process that underrepresents persons age seventy and over." *Id.* at 9.

## IV. DISCUSSION

In *United States v. Royal*, 174 F.3d 1 (1st Cir. 1999), the First Circuit laid down the principles underlying the right to "an impartial jury." *Id.* at 6 (quoting U.S. CONST. amend. VI). "The American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." *Id.* at 5-6 (quoting *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975)). At the same time, the requirement of a fair cross-section "does not guarantee that juries be 'of any particular composition,' *id.* at

10

6 (quoting *Taylor*, 419 U.S. at 538), or that 'venires . . . be a substantially true mirror of the community." *Id.* (quoting *Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir. 1985) (en banc). "In order to make out a prima facie case of a violation of the fair cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
> (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

*Id.* (quoting *Duren v. Missouri*, 439 U.S. 357 at 364). 28 U.S.C. § 1867(a) provides:

> In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

Mr. Stile moves pursuant to this provision to dismiss the indictment. *Def.'s Mot.* at 1-11.

### A. Distinctive Group

Mr. Stile's argument fails at its premise. He contends that different age groupings constitute a "distinctive group in the community" for purposes of the fair cross-section requirement. *Def.'s Mot.* at 7-10. In *United States v. Tsarnaev*, No. 13-10200-GAO, 2014 U.S. Dist. LEXIS 148193 (D. Mass. Oct. 17, 2014), however, the district court in Massachusetts addressed this same issue involving the same expert:

> The Supreme Court has treated African-Americans, Mexican-Americans, and women as distinctive groups for purposes of assessing "jury-representativeness" claims under both the fair cross section

11

standard of the Sixth Amendment and the equal protection standard of the Fifth and Fourteenth Amendments. *See Taylor*, 419 U.S. at 532-33 (women); *Castaneda v. Partida*, 430 U.S. 482, 494-95 (1977) (Mexican-Americans); *Peters v. Kiff*, 407 U.S. 493, 498-99 (1972) (African-Americans). It has not spoken to the question whether persons within a specified age group may be deemed a distinctive group for such purposes.

*Id.* at *11-12. Furthermore, as the *Tsarnaev* Court pointed out, the First Circuit previously addressed a similar issue and declined to regard a proposed age group as distinctive in this context. *Id.* at *12 (citing *Barber*, 772 F.2d at 997).

In *Barber*, the First Circuit addressed whether people between the ages of 18 and 34 represent a distinctive group and concluded that they do not. *Barber*, 772 F.2d at 1000. The *Barber* Court disputed whether people between 34 and 18 "belong to a particular group." *Id.* at 998. It asked "what is the evidence that the attitudes and thinking of, say, 30 year olds have more in common with 18 year olds than 40 year olds?" *Id.* The First Circuit wrote:

> Without much effort we can point to various significant social indicators that would seem to punctuate clear differences in the attitudes, values, ideas and experiences of 18 year olds vis-a-vis 34 year olds, to pick only the outer boundaries of appellant's "young adults" classification. Taking judicial notice of official statistics we can note meaningful contrasts in such social indicators as their marital and divorce rates, school enrollment and educational attainment, economic status, employment rate, criminality, experience in such matters as service in the armed forces in time of war or even in peacetime, mental health, attitude towards such important social issues as abortion, and participation in the political processes, and in the ownership of capital property. Such differences emphasize the inappropriateness of grouping potently dissimilar age categories, if we are to do other than pay mere lip service to the teachings of *Duren*.

*Id.* at 998-99 (footnotes omitted). This same analysis can easily be extended to any of the generational groupings Mr. Martin proposes.

12

Furthermore, Mr. Martin defined these generational groupings but has not explained why they should constitute groupings worthy of constitutional protection. *See Martin Decl.* at 6. Indeed, the empirical documentation of the existence of identifiable generational groups is remarkably thin. Mr. Martin refers generally to the Pew Research Center as authority for his generational delineations but offers no further specificity. *See id.* ("The Pew Research Center has delineated generations for the purpose of studies of traits and attitudes").

In his motion, Mr. Stile (not Mr. Martin) cites a marketing study published in the Journal of Behavioral Studies in Business in April 2011. *Def.'s Mot.* at 8 (citing Kaylene C. Williams & Robert A. Page, *Marketing to Generations*, J. OF BEHAVIORAL STUDIES IN BUSINESS (April 2011)). However worthwhile the article may be for helping businesses market their products to consumers, it is hardly sufficient to create a new category of constitutional dimensions for purposes of "the fair cross section requirements of either the Sixth Amendment or the [JSSA]." *Tsarnaev*, 2014 U.S. Dist. LEXIS 148193, at *16-17. Indeed, Mr. Martin defines the "Silent Generation" as having been born before 1946, making them 68 and older, which does not fit exactly into the District's over 70 exemption. *Martin Decl.* at 6. But to complicate matters, the Williams/Page article has a separate category for people between 65 and 80 that its authors call the "Depression Generation", and yet another category for people who are 80 and older, which the authors describe as the "Pre Depression Generation". *Tsarnaev,* at *16-17. As Mr. Martin's generational

13

categories do not coincide with the Williams/Page generational categories, this suggests that the groups are not nearly as cohesive and distinctive as Mr. Stile claims.

In sum, the Court agrees with the district judge's characterization of the Williams/Page article as "little more than breezy intuitive advice about how to market to those folks." *Tsarnaev* at *17. So even if a case could be made, which the Court doubts, for Mr. Martin's generational divisions as a foundational requirement for a fair cross-section under the Sixth Amendment, it has not been made here. Finally, the notion that marketing categories or subcategories could form the basis of distinctive groups for purposes of constitutional and statutory fair cross-section requirements trivializes the important public policy concerns about past and current discrimination that underlie these requirements.

The bottom line, however, is that the First Circuit has ruled en banc against Mr. Stile's theory. *Barber*, 772 F.2d at 1000. There is no suggestion that the tectonic plates underlying *Barber* have shifted. *See United States v. Reveron Martinez*, 836 F.2d 684, 687 n.2 (1st Cir. 1988) ("[T]here may be occasions when courts can—and should—loosen the iron grip of *stare decisis*"). To the contrary, other circuit courts have rejected similar age-based arguments. *See, e.g., Brewer v. Nix*, 963 F.2d 1111, 1112-13 (8th Cir. 1992) (persons over the age of 65); *Silagy v. Peters*, 905 F.2d 986, 1009-11 (7th Cir. 1990) (persons aged 70 and over); *Wysinger v. Davis*, 886 F.2d 295, 296 (11th Cir. 1989) (per curiam) (persons aged 18 to 25); *Ford v. Seabold*, 841 F.2d 677, 682 (6th Cir. 1988) ("young adults" between the ages of 18 and 29); *David v. Greer*, 675 F.2d 141, 146 (7th Cir. 1982) ("Young people between the ages of 18 and

21 . . . are not a cognizable group or class"); *United States v. LaChance*, 788 F.2d 856, 876 (2d Cir. 1981) ("Courts of Appeals have uniformly held that age groups are not "distinctive" enough for Sixth Amendment (fair cross section) purposes"); *United States v. Potter*, 552 F.2d 901, 905 (9th Cir. 1977) ("young people" between 18 and 34 are not a cognizable group); *United States v. Test*, 550 F.2d 577, 593 (10th Cir. 1976) ("[W]e hold that movants have not made a prima facie showing that persons under 40 years of age are a cognizable group"). As this Court is duty bound to apply the teachings of the First Circuit, Mr. Stile's generational imperative must fail. *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1993) (The doctrine of stare decisis "renders the ruling of *law* in a case binding in future cases before the same court or other courts owing obedience to the decision") (emphasis in original).

### B. Failure to Comply with the Plan

Mr. Stile's contention is that the Clerk failed to comply with the provisions of the Plan in two ways: first by failing to summon prospective jurors who failed to return completed questionnaires; and, second by failing to follow up with jurors who returned questionnaires with significant errors or omissions. *Def.'s Mot.* at 2-6. Regarding the first issue, although Mr. Stile claims there "has been a substantial violation of this obligation", *Def.'s Mot.* at 2, the Plan and 28 U.S.C. § 1864(a) make it clear that the summons procedure is discretionary. *Plan* at 7 ("If any person fails to return a completed juror questionnaire form as instructed, the Clerk may thereupon pursue the matter in accordance with 28 U.S.C. § 1864(a)"); § 1864(a) ("Any person who fails to return a completed jury questionnaire form as instructed

15

may be summoned by the clerk or jury commission forthwith to appear before the clerk or jury commission to fill out a juror qualification form").

It is true that the statute and the Plan use mandatory language in requiring the Clerk to follow up omissions, ambiguities, or errors in completed questionnaires. § 1864(a) ("In any case in which it appears that there is an omission, ambiguity, or error on a form, the clerk . . . shall return the form with instructions to the person to make such additions or corrections as may be necessary and to return the form to the clerk . . . within ten days"); *Plan* at 7.

But in *Royal*, the First Circuit considered and rejected the argument that the Clerk's failure to follow up such questionnaires constitutes a "substantial failure to comply" as required in 28 U.S.C. § 1867(a). 174 F.3d at 11. The First Circuit defined "substantial failure to comply" under § 1867(a) as "one that contravenes one of two basic principles: (1) random selection of jurors, and (2) determination of juror disqualification, excuses, exemptions, and exclusions on the basis of objective criteria." *Id.* (quoting *United States v. Savides*, 787 F.2d 751, 754 (1st Cir. 1986)). The *Royal* Court stressed that "[t]echnical violations, or even a number of them, that do not frustrate these requirements and do not result in discrimination or arbitrariness do not constitute a substantial failure to comply." *Id.* (quoting *Savides* at 754).

Thus, in *Tsarnaev*, the district court pointed out that the failure to provide information about the undelivered summonses was fatal to the claim of "substantial failure to comply" because the defendant "failed to show that the omission to send

16

replacement summonses compromised either the principle of random selection of jurors or the principle that juror qualification is to be assessed on objective criteria." 2014 U.S. Dist. LEXIS 148193 at *8. Furthermore, to the extent Mr. Stile has unearthed some issues with the information on individual questionnaires, they are "technical violations" and a far cry from a "substantial failure to comply" as the First Circuit defines it.

## V. CONCLUSION

The Court DENIES the Defendant's Motion to Dismiss Indictment and Stay Proceedings Pending Reconstituting Jury Wheel to Conform to Statutory and Constitutional Fair Cross Section Requirements (ECF No. 476).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 28th day of October, 2014