UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JAMES STILE, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) 1:11-cr-00185-JAW |
| | ) 1:17-cv-00159-JAW |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

**ORDER AFFIRMING THE RECOMMENDED DECISION
OF THE MAGISTRATE JUDGE ON 28 U.S.C. § 2255 MOTION**

Having viewed videotapes of various incidents during the defendant's incarceration, the Court rejects the defendant's contention that his defense counsel should have moved for a downward departure under United States Sentencing Guideline § 5K2.0 based on the conditions of the defendant's confinement. Based on its review of the record, the Court concludes that defense counsel's decision not to raise the defendant's conditions of presentence confinement to argue for a lower sentence did not render counsel's performance below an objective standard of reasonableness.

## I.    PROCEDURAL BACKGROUND

On April 28, 2017, James Stile filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  *Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Fed. Custody* (ECF No. 637) (*Stile Mot.*).  On May 1, 2017, the Magistrate Judge ordered the United States to respond to the

motion. *Order to Ans.* (ECF No. 640). On July 21, 2017, the United States filed its response. *Mot. for Summ. Dismissal of "Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sent. By a Person in Fed. Custody"* (ECF No. 648) (*Gov't Opp'n*). On August 25, 2017, Mr. Stile filed a reply. *Pet'r's Reply to Respondent's Resp. to Pet'r's Mot. to Vacate, Set Aside or Correct Sent. Pursuant to Title 28 U.S.C. § 2255* (ECF No. 662) (*Stile Reply*). On the same day, the Court referred Mr. Stile's motion to the Magistrate Judge for a recommended decision.

On October 6, 2017, the Magistrate Judge issued a recommended decision in which he recommended that the Court decline to order an evidentiary hearing, deny Mr. Stile's motion for writ of habeas corpus, and deny a certificate of appealability. *Recommended Decision on 28 U.S.C. § 2255 Mot.* at 22 (ECF No. 669) (*Recommended Decision*). The Recommended Decision notified Mr. Stile that if he wished to object to the motion, he must do so within fourteen days of being served a copy of the Recommended Decision. *Id.* The docket indicated that Mr. Stile must file an objection by October 20, 2017.

On October 23, 2017, Mr. Stile moved for an extension of time within which to file an objection to the Recommended Decision. *Mot. for Extension of Time Within Which to File Obj. to Magistrate's Recommendation and Report Dec. ECF No. 669* (ECF No. 672). Mr. Stile requested sixty days to file an objection. *Id.* On October 24, 2017, the Court granted Mr. Stile's motion for extension in part and denied it in part. *Order* (ECF No. 673). The Court allowed Mr. Stile an additional thirty, not

sixty days, to file any objection to the Recommended Decision, making Mr. Stile's objection due by November 27, 2017. *Id.*

Mr. Stile failed to file an objection to the Recommended Decision by that date and, tugging on the deadline to make certain that the mailbox rule is complied with, the Court waited until December 7, 2017 to see if Mr. Stile was going to file an objection to the Recommended Decision. As ten days passed since Mr. Stile was required to place his objection in the prison mail system, the Court concluded that Mr. Stile failed to make a timely objection to the Magistrate Judge's October 6, 2017 Recommended Decision. On December 8, 2017, however, Mr. Stile filed his objections to the Recommended Decision, *Pet'r's Opp'n to Recommended Decision on 28 U.S.C. § 2255 Mot.* (ECF No. 682) (*Stile Obj.*), and therefore on December 18, 2017, the Court vacated its affirmance. *Order Vacating Order Affirming the Recommended Decision of the Magistrate Judge on 28 U.S.C. § 2255 Mot.* (ECF No. 683). On December 20, 2017, the Government filed its response to Mr. Stile's objection to the Recommended Decision. *Resp. of the United States to Pet'r's Opp'n to Recommended Decision Denying Mot. Under 28 U.S.C. § 2255* (ECF No. 684) (*Gov't's Resp.*). On February 13, 2018, Mr. Stile filed a supplementary response. *Continuation of Pet'r's Obj. to Magistrate Judge's Recommended Decision on 28 U.S.C. § 2255 Mot. Before this Court* (ECF No. 687) (*Stile Supp.*).[1]

---

[1]     The Court GRANTS James Stile's Motion to Supplement Objection (ECF No. 687). Although the Government has not responded to the contents of Mr. Stile's February 13, 2018 filing, the Court addressed the issues in the supplementary objection and does not perceive the need for a Government response.

## II.  FACTUAL BACKGROUND

### A.  Crime and Punishment

Early in the evening of September 12, 2011, James Stile entered the E.W. Moore & Son Pharmacy in Bingham, Maine.  *United States v. Stile*, 845 F.3d 425, 427 (1st Cir. 2017).  He wore a baseball cap, sunglasses, a dust mask, and purple rubber gloves.  *Id.*  As he entered the store, he pulled a sawed-off shotgun from his pants.  *Id.*  He walked to the pharmacy counter at the back of the store and ordered three employees to lie on their stomachs.  *Id.*  When a customer walked in, Mr. Stile forced him behind the pharmacy counter with the employees.  *Id.*  Mr. Stile handed the owner of the pharmacy a black duffel bag and ordered him to fill it with drugs.  *Id.*  Mr. Stile tied the hands and feet of the owner, the customer, and the employees with zip ties.  *Id.*  He then departed the store, taking about $12,890 worth of drugs and $417 in cash.  *Id.*

On October 20, 2011, a federal grand jury indicted Mr. Stile for committing this pharmacy robbery.  *Indictment* (ECF No. 8).  On October 30, 2014, Mr. Stile pleaded guilty to this charge.  *Min. Entry* (ECF No. 541).  The Court sentenced Mr. Stile on May 29, 2015.  *J.* (ECF No. 579).  The Court ordered Mr. Stile incarcerated for 120 months, placed him on supervised release for five years following his incarceration, ordered him to pay restitution to E.W. Moore & Son, and ordered him to pay a $100 special assessment.  *Id.*

### B.  Appeal

Mr. Stile appealed his sentence on substantive and procedural grounds. *Stile*, 845 F.3d at 427. On appeal, Mr. Stile raised three procedural issues: (1) the imposition of a two-level obstruction of justice enhancement under United States Sentencing Guidelines (U.S.S.G.) § 3C1.1; (2) the denial of a two-level reduction under U.S.S.G. § 3E1.2(a), and (3) whether the Court gave sufficient weight to Mr. Stile's evidence of drug addiction. *Id.* at 427-28. Finally, Mr. Stile made a "catch-all argument" that the 120-month sentence was "substantively unreasonable." *Id.* at 428. On January 3, 2017, the First Circuit Court of Appeals rejected Mr. Stile's appeal and affirmed the sentence. *Id.* at 434.

### C. James Stile's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody

In his initial filing, Mr. Stile raised three main issues, all relating to supposed ineffective assistance of counsel: (1) that his defense lawyer failed to move the Court for a downward departure under U.S.S.G. § 5K2.0, (2) that his defense lawyer failed to advise him about the firearms enhancement under U.S.S.G. § 2B3.1(b)(2)(C) and the dangerous weapon enhancement under U.S.S.G. § 2B3.1(b)(2)(E), and (3) that his defense lawyer failed to secure witnesses by subpoena or produce affidavits or statements at the sentencing hearing to mitigate allegations of obstruction of justice. *Stile Mot.* at 4.[2] Later in his motion, Mr. Stile questioned the procedural reasonableness of his sentence on three bases: (1) an alleged error by the sentencing court in applying a two-level enhancement on the ground that Mr. Stile had

---

[2] There is a one-page difference between the pagination of Mr. Stile's motion and the pagination of the ECF document because the motion starts at page 2. The Court uses the ECF pagination.

committed perjury while testifying at a suppression hearing, (2) an alleged error by the sentencing court by failing to grant a two-level reduction for acceptance of responsibility, and (3) an alleged error by the sentencing court in failing to consider the fact that a physician, not drug abuse, caused Mr. Stile's addiction to drugs. *Id.* at 5. Finally, Mr. Stile alleges that the Government was involved in prosecutorial misconduct by placing an informant in Mr. Stile's cell during a time that he was represented by defense counsel in an effort to gather information against him. *Id.* at 7.

### D. The Recommended Decision

#### 1. Downward Departure Under U.S.S.G. § 5K2.0

After reviewing the facts and the legal standards, the Magistrate Judge turned to Mr. Stile's first allegation: that his defense counsel rendered ineffective counsel by failing to move for a downward departure under U.S.S.G. § 5K2.0 because Mr. Stile contends he "was subjected to torture and substandard conditions while he was in pretrial detention at various county jails." *Recommended Decision* at 5-6. Mr. Stile's allegations of mistreatment were against Somerset County Jail (four to twelve electric shocks daily, kicked and beaten, held in solitary confinement), Cumberland County Jail (injured), and Strafford County Jail (inadequate medical treatment after a spinal injury caused by an assault by another inmate and inadequate treatment for a dental condition). *Id.* at 6-7. Mr. Stile alleges that the substance of his abuse allegations against the County Jails was before the Court at the sentencing hearing in the form of a Microsoft PowerPoint presentation. *Id.* at 7. He also contends that

his appellate counsel was ineffective for failing to include an argument about the conditions of his confinement. *Id.* at 8.

The Magistrate Judge reviewed the status of the law in the First Circuit concerning downward departures under § 5K2.0 based on the conditions of confinement and observed that in *United States v. Ortiz*, 6 F. App'x 46 (1st Cir. 2001), the First Circuit commented that it had "never before held that conditions of confinement constitute a permissible basis for downward departure." *Recommended Decision* at 9 (quoting *Ortiz*, 6 F. App'x at 48). Even if available, the Magistrate Judge observed that such a departure would be "highly infrequent" and would be given the deference afforded the trial court upon review of a decision as to whether to permit a downward departure. *Id.* at 10 (quoting *United States v. De Jesús*, 223 F. App'x 7, 8 (1st Cir. 2007)). Accordingly, the Magistrate Judge concluded that Mr. Stile "cannot establish the necessary substandard performance by sentencing counsel based on the failure to move for a downward departure, or by appellate counsel based on the failure to raise the issue on appeal." *Id.* Finally, the Magistrate Judge noted that the sentencing judge was aware of Mr. Stile's allegations of abuse because, in addition to the PowerPoint presentation, and that Mr. Stile himself told the sentencing judge about his abuse in jail. *Id.* at 10, 10 n.10 (citing *Sentencing Tr.* 133, 136, 144).

## 2. Firearms Enhancement Under U.S.S.G. § 2B3.1(b)(2)(C)

In his motion, Mr. Stile challenged the effectiveness of his defense lawyer's alleged advice that he concede a five-level enhancement in the offense level under U.S.S.G. § 2B3.1(b)(2)(C) for a firearms-related specific offense characteristic. *Id.* at

11 (citing *Stile Mot.* Attach. 1 *Mem. of Law and Argument in Support of Pet. James Stile's Mot. to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255* at 22 (*Stile Mem.*)). Mr. Stile instead argued that "[w]hat was appropriate was a (3) three point enhancement pursuant to § 2B3.1(b)(2)(E)." *Id.* (citing *Stile Mem.* at 23). He also said that the application of both the firearms enhancement and the enhanced statutory penalty under 18 U.S.C. § 2118(c)(1) constitutes an impermissible double-counting. *Id.* (citing *Stile Mem.* at 28-29).

The Magistrate Judge rejected this argument because his defense counsel did in fact argue for a three-level enhancement, rather than a five-level enhancement. *Id.* at 11 (citing *Presentence Investigation Report* ¶¶ 6, 22). The Magistrate Judge concluded that Mr. Stile had demonstrated neither deficient performance of defense counsel nor prejudice. *Id.* at 12. The Magistrate Judge also rejected the double-counting issue, noting that it was procedurally defaulted and citing First Circuit cases in which double-counting was permitted. *Id.* at 12-13.

### 3. Obstruction of Justice Under U.S.S.G. § 3C1.1

During Mr. Stile's sentencing hearing, the Court found that he had obstructed justice by assaulting an inmate for cooperating with the Government at the Somerset County Jail on December 20, 2011 and by committing perjury about a material matter during a suppression hearing before a federal judge. *Tr. of Proceedings, Sentencing Proceedings* 30:19-31:19; 39:5-70:19 (ECF No. 610) (*Sentencing Tr.*). The Magistrate Judge observed that Mr. Stile raised the obstruction of justice enhancement based on perjury before the First Circuit and that the First Circuit rejected his contentions.

*Recommended Decision* at 14-15. Therefore, the Magistrate Judge concluded that he "may not relitigate the perjury finding." *Id.* at 15.

As to the assault, the Magistrate Judge did not find that Mr. Stile's additional evidence, namely the statement of an inmate who witnessed the assault, was persuasive. *Id.* at 16-17. Both at the sentencing hearing and in his pending motion, Mr. Stile claimed that the reason he assaulted the inmate was because the inmate made a sexual advance toward him, not because the inmate cooperated against him. *Sentencing Tr.* 44-24-45:1 ("The defendant says he assaulted the inmate because the other inmate had made a sexual advance"); *Stile Mem.* at 33 ("The petitioner aver[r]ed that the assault took place in retaliation to a sexual advance towards the Petitioner made by Ernest Almeida which was instigated by another inmate that inmate Almeida was paying protection to"). But after reviewing the new evidence, the Magistrate Judge was not convinced that it would have "carried significant weight, particularly given the Court's credibility determination." *Recommended Decision* at 16-17.

Mr. Stile also claimed "prosecutorial misconduct and related ineffective assistance of counsel during the investigatory process." *Id.* at 17. He alleged that the inmate that he assaulted was placed in Mr. Stile's cell "purposely to review and inform the Government about documents counsel had provided Petitioner." *Id.* Mr. Stile made several other allegations about this inmate. *Id.* The Magistrate Judge noted that Mr. Stile did not make these allegations at the sentencing hearing. *Id.* At the sentencing hearing, the Court found that "[a] fellow inmate informed authorities

that Stile had confessed to having committed the robbery, relating many specific details that the inmate could not have made up." *Id.* (quoting *Stile*, 345 F.3d at 428). The Court ultimately concluded that Mr. Stile had assaulted the inmate because of the inmate's cooperation with law enforcement. *Id.* After the Court announced its decision on the obstruction of justice enhancement, Mr. Stile asked to testify and the Court warned him that if he did so and if the Court concluded he lied, he could face a harsher sentence. *Id.* Hearing the Court's warning, Mr. Stile expressly stated that he would accept the Court's ruling. *Id.*

The Magistrate Judge stated that he did not need to reach the merits of Mr. Stile's obstruction of justice claim, because he determined that Mr. Stile's attack on the perjury basis for obstruction of justice failed and therefore Mr. Stile could not demonstrate prejudice based on the assault as a separate basis for the same enhancement. *Id.* at 19. Even so, the Magistrate Judge wrote that if he reached the merits of the prosecutorial misconduct claim, it would fail on its merits. *Id.* According to the Magistrate Judge, this is because—among other things—even if Mr. Stile could have demonstrated a violation of constitutional magnitude from these facts, the exclusionary rule would not have barred the Court's consideration of the facts at his sentencing hearing. *Id.* at 19-20.

### 4. Denial of Acceptance of Responsibility Under U.S.S.G. § 3E.1

The Magistrate Judge rejected Mr. Stile's challenge to the denial of acceptance of responsibility at the sentencing hearing because the First Circuit discussed that issue and resolved it against Mr. Stile. *Id.* at 20-21 (citing *Stile*, 345 F.3d at 432).

### 5. James Stile's Drug Addiction

Similarly, the Magistrate Judge rejected Mr. Stile's objection to the sentencing court's supposed failure to consider the physician source of his drug addiction because the First Circuit resolved that issue against Mr. Stile. *Id.* at 21-22 (citing *Stile*, 345 F.3d at 433).

### 6. Substantive Unreasonableness

Lastly, the Magistrate Judge refused to revisit Mr. Stile's argument that the sentence was substantively unreasonable, because the First Circuit reached that issue and decided it against Mr. Stile. *Id.* at 22 (citing *Stile*, 345 F.3d at 433-34).

### E. James Stile's Objection

On December 8, 2017, Mr. Stile filed his objections to the Recommended Decision. *Stile Obj.* at 1-8. Preliminarily, Mr. Stile states that he "agrees with the legal standards as set forth in this section of the Magistrate [Judge's] Report and Recommendation." *Id.* at 1-2.

### 1. Lack of Sworn Declarations to Attachments

In his objection, Mr. Stile first concedes that he has no objection to the Magistrate Judge's statement about the factual and procedural background to his § 2255 petition, except that he disagrees with the contents of footnote one in the Recommended Decision. *Id.* at 1. The Court overrules that objection. In footnote one, the Magistrate Judge observed that the Government argued that some of Mr. Stile's allegations, which were set forth in attachments, should not be considered because they were not signed under penalty of perjury. *Recommended Decision* at 3,

n.1. However, the Magistrate Judge noted that 28 U.S.C. § 1746 does not appear to require that each attachment to a § 2255 motion be separately sworn to, and that in any event, rather than dismiss his motion on this basis, the Court would allow Mr. Stile to submit amended filings containing sworn declarations. *Id.* Because the Magistrate Judge ruled against the Government on this issue, Mr. Stile is in no position to complain about a ruling in his favor.

### 2. Assault

Mr. Stile concedes that this Court need not consider the assault issue because the First Circuit decided it. *Id.* at 2. Nevertheless, Mr. Stile asks the Court to be "open-minded" and to "review the submission of the Petitioner in his 2255 as it should shed a new light on how the CI obtained his information which the Petitioner detailed extensively and defense counsel failed to detail for this Court when he did have the information available." *Id.* Mr. Stile says that Alfarabick Malley's affidavit was not before the Court at the sentencing hearing, which the Court "acknowledged at the time of sentencing due to defense counsel's failure to obtain a statement or the witness himself for the sentencing proceeding." *Id.* at 2-3. Mr. Stile says this information was not available to the sentencing court or to the Court of Appeals and he urges the Court to consider it. *Id.*

### 3. Perjury

Mr. Stile also urges the Court to grant a "fresh view" of the perjury allegation. *Id.* at 3. He contends that the issue was "tainted by defense counsel." *Id.* at 3.

### 4. Downward Departure Under § 5K2.0

Mr. Stile reiterates his objection to his defense lawyer's decision not to move for a downward departure based on his being subjected to "torture and substandard conditions while he was a pretrial detainee at various county jails." *Id.* at 3. Mr. Stile states that his defense lawyer "was to present videographic evidence of what amounted to torture at the Somerset County Jail in Maine but he did not." *Id.*

Mr. Stile references three videotapes, which he says were filed as exhibits in *Stile v. Somerset County*, No. 1:13-cv-00248-JAW. *Id.* at 3-4. Mr. Stile "insists upon the Court reviewing these three videos to allow for a fair review as to whether the Petitioner qualifies as a person who should be granted a downward departure for the illegal conduct of his jailers when he was a pretrial detainee." *Id.* at 4. Mr. Stile directs the Court to the video of a "cell extraction" of December 31, 2011, and videos of events both occurring on January 5, 2012. *Id.* He says that among Somerset County Jail, Cumberland County Jail, and Strafford County Jail, "the jail that stands out the most is what transpired at the Somerset County Jail during a (39) thirty-nine day period of time while the Petitioner was a pretrial detainee." *Id.*

Mr. Stile concedes that he has "no idea" whether the Court "viewed the actual video that was imbedded into the PowerPoint [p]resentation." *Id.* at 4. Assuming the Court did not view the videotapes, however, Mr. Stile asserts that "it is clear that the Court has misapprehended and or misunderstood a material fact that is central that is and was central to the issue of downward departure and/or variance of the sentence imposed against the Petitioner." *Id.* at 4-5. Although Mr. Stile maintains that the three videotapes are "not the only grounds for a departure from the sentence imposed,

but are also a crucial keystone to establish the fact that Petitioner has suffered a great injustice and 8th Amendment violation before this Court imposed its sentence on him." *Id.* at 5.

Mr. Stile contends that the Magistrate Judge was "misguided" in his conclusion that a § 5K2.0 downward departure based on conditions of confinement would be "highly infrequent." *Id.* Mr. Stile argues that if the Court refused to consider the conditions of his confinement as a basis for reducing his sentence, it would be "the epitome of the Court turning a blind eye to the infringement of the Petitioner's Constitutional rights and would be a complete and utter disregard for the very fiber of the Bill of Rights." *Id.* at 6. Mr. Stile clarifies that he is seeking a variance or departure "in light of the egregious conduct of his jailers that is depicted on videos in possession of the Court that were clearly [c]onstitutionally violative."[3] *Id.* at 7. Mr. Stile says that he has cited three cases, *United States v. Meteo*, *United States v. Hernandez-Santiago*, and *United States v. Brinton*, from "the leading Circuits in the Country, the 2nd and the 9th." *Id.* He argues that the facts in those cases are "nowhere near as constitutionally violative as this case with 39 days of being shocked." *Id.* Based on these videos, he urges the Court to conclude that they demonstrate his entitlement to a "highly infrequent" downward departure and that they "should have been played at the sentencing for the US Attorney to view and the victims." *Id.* at 7-

---

[3]     In his objection, Mr. Stile refers to footnote seven in the Recommended Decision, which mentions the Court's reference at the sentencing hearing to the "substantial delay" occasioned by Mr. Stile's "tumultuous relations with his own defense lawyers." *Stile Obj.* at (citing *Recommended Decision* at 8, n.7). The Court is uncertain why Mr. Stile highlighted footnote seven. But the Court later in its sentencing comments stated "Nevertheless, to be absolutely clear, the court does not hold the delay, the serial lawyers, the countless motions against the defendant for purposes of sentencing." *Sentencing Tr.* 195:8-10.

8. Mr. Stile contends that his requested variance "should not be weighed with or against the Petitioner[']s crime of conviction" and should be viewed "solely on the circumstances of the conditions of confinement pretrial detention." *Id.* at 8.

## F.    The Government's Response

In the Government's view, Mr. Stile has objected to only one of his original five grounds for § 2255 relief, namely that his defense lawyer was ineffective for failing to move for a downward departure based on the adverse conditions of his confinement. *Gov't's Resp.* at 3. The Government says that in order to prove his defense lawyer was ineffective, Mr. Stile is required to prove that the pretrial conditions of detention at Somerset County Jail, the Cumberland County Jail, and/or the Strafford County Jail "were sufficiently atypical to take his case out of the Guidelines' heartland." *Id.* The Government cites caselaw in which appellate courts upheld a sentencing court's refusal to depart downward based on the conditions of pretrial confinement. *Id.* at 3-4. The Government says that "[c]ompetent counsel would have realized based on his investigation that a motion for a departure because of the alleged conditions of his client's pretrial detention would have been frivolous." *Id.* at 4. The Government writes that a downward departure based on conditions of confinement would not have been authorized under First Circuit law and the sentencing court would not have granted such a downward departure had one been pressed by defense counsel. *Id.* at 5.

### G. James Stile's Supplemental Filing

Citing *United States v. Mulkern*, No. 1:15-cr-00054-JAW, 2017 U.S. Dist. LEXIS 191486 (D. Me. Nov. 20, 2017), Mr. Stile states that this Court "demonstrated a degree of compassion through the use of a downward departure by means of employing the use of U.S.S.G. § 5K2.0(a)(2)(B), precisely what this Petitioner avers counsel Rodway Esq. failed to do that resulted in a 6th Amendment violation by the denial of effective assistance of counsel." *Stile Supp.* at 1. Mr. Stile reiterates many of the same arguments set forth in his original filing and reply, particularly his urgent demand that the Court view the videos of his cell extractions. *Id.* at 1-10.

Mr. Stile also contends that Attorney Rodway should have maintained his objection to the firearms enhancement, contending that Attorney Rodway advised him that if he waived his objection to the firearms enhancement, he would be more likely to be granted a three-level reduction for acceptance of responsibility. *Id.* at 10-11. In light of this Court's denial of acceptance of responsibility, Mr. Stile believes Attorney Rodway's advice was unsound. *Id.*

## III. DISCUSSION

### A. Legal Standard

As noted earlier, Mr. Stile voiced no objection to the Magistrate Judge's description of the legal standards applicable to his § 2255 petition. *Stile Obj.* at 1-2. In the Recommended Decision, the Magistrate Judge wrote that in *Strickland v. Washington*, 466 U.S. 668, 688 (1984), the United States Supreme Court required habeas corpus petitioners to demonstrate that "counsel's representation fell below an

objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Recommended Decision* at 4-5 (quoting *Strickland*, 446 U.S. at 697).

## B.    The Unobjected-To Claims

In his original petition, Mr. Stile raised ineffective defense counsel claims: (1) the failure to move for a downward departure under U.S.S.G. § 5K2.0, (2) the asserted failure to argue against a five-level enhancement for brandishing or possessing a firearm during the course of the robbery under U.S.S.G. § 2B3.1(b)(2)(C), (3) the obstruction of justice enhancement under U.S.S.G. § 3C1.1, (4) the sentencing court's denial of acceptance of responsibility under U.S.S.G. § 3E1.1, (5) the cause of James Stile's drug addiction, and (6) the substantive unreasonableness of the sentence as a whole. *Stile Mot.* at 1-13. In his objection to the Recommended Decision, however, even though he acknowledged that the Court is not required to review issues already decided by the First Circuit Court of Appeals, Mr. Stile asked the Court to reconsider the issue of his assault of a fellow inmate and his alleged perjury during the suppression hearing, both of which the Court relied on in imposing the two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. *Id.* at 2-3. In his objection, however, Mr. Stile focuses on his contention that his defense lawyer was ineffective for failing to raise the conditions of his confinement as a basis for a downward departure under U.S.S.G. § 5K2.0. *Id.* at 3-8. Mr. Stile did not object to

the Magistrate Judge's rulings on (1) the five-level firearms enhancement under U.S.S.G. § 2B3.1(b)(2)(C), (2) the denial of acceptance of responsibility under U.S.S.G. § 3E1.1, (3) the cause of Mr. Stile's drug addiction as a basis for a lower sentence, and (4) the substantive unreasonableness of the sentence as a whole. Despite the lack of objection, the Court performed a de novo review of the Magistrate Judge's Recommended Decision on each of the unobjected to issues and agrees with the Magistrate Judge's recommendations for the reasons set forth in his Recommended Decision. However, in his supplemental filing, Mr. Stile objected to Attorney Rodway's failure to maintain his objection to the firearms enhancement. *Stile Supp.* at 10-11.

### C. The Assault and Perjury Bases for the Obstruction of Justice Enhancement Under U.S.S.G. § 3C1.1

As Mr. Stile acknowledged, a prisoner may not raise in a § 2255 motion the same issues that the appellate court addressed and resolved on appeal. Under First Circuit law, a prisoner does not have the right "to recast arguments already rejected in connection with the 'ineffective assistance' claim." *Singleton v. United States*, 26 F.3d 233, 239-40 (1st Cir. 1994). In *Conley v. United States*, 323 F.3d 7 (1st Cir. 2003), the First Circuit wrote that "[c]laims that previously have been addressed on direct review . . . may not be readjudicated collaterally under § 2255, absent equitable considerations, such as actual innocence or cause and prejudice." *Id.* at 22.

Regarding the assault, as an attachment in his § 2255 petition, Mr. Stile provided a document titled "Affidavit" dated January 22, 2016 signed (but not sworn

to) by Alfarabick Mallay[4] in which Mr. Mallay states that he witnessed the fight between Mr. Stile and another inmate and that Mr. Mallay holds a "sincere belief that this fight oc[c]urred because of what happened under the dining table and for no other reason." *Stile Mot.* Attach. 6 (*Aff. of Alfarabick Mallay* at 1) (*Mallay Aff.*). Mr. Mallay says that at some point before the fight, he was sitting next to Mr. Stile and the future victim of the fight was sitting across the table from Mr. Stile and himself. *Id.* Mr. Mallay concedes that he did not see exactly what happened under the table

---

[4]     Alfarabick Mallay's "affidavit" would have been of highly questionable admissibility at the sentencing hearing. Alfarabick Mally was a defendant before this Court in a multi-defendant drug dealing conspiracy. *See United States v. Manuel Trinidad-Acosta*, No. 1:11-cr-00205-JAW. On September 7, 2012, Alfarabick Mally, who also goes by the name Jacob Garcia, appeared before the Court and entered a guilty plea to engaging in a conspiracy to distribute more than 28 grams of cocaine base. *Id.* (ECF No. 280).

Mr. Mally entered into two plea agreements pursuant to his guilty plea. *Id.* (ECF No. 274, 275). The signatures to his plea agreements look nothing like the signature on the affidavit submitted in this case. *Compare Agreement to Plead Guilty* at 5 (ECF No. 274) and *Mandatory Plea Agreement Supp.* at 5 (ECF No. 275), *with Mallay Aff.* at 1. At his Rule 11 on September 12, 2012, Alfarabick Mally confirmed that the signatures in the plea agreements were in fact his signatures. *Tr. of Proceedings, Rule 11 Proceedings* 15:10-12 (ECF No. 513).

Furthermore, Alfarabick Mallay spells his last name "Mallay" in the submitted affidavit, but he spells his last name Mally in all of the paperwork submitted in his criminal case. At his Rule 11, the Court asked Alfarabick Mally about the spelling of his last name and he confirmed that his last name was spelled "Mally": "The Court: All right. We'll call you Mally, then. And that's M-a-l-l-e-y? A. The Defendant: M-a-l-l-y." *Id.* 2:19-21.

Indeed, when Alfarabick Mally testified at the trial of two of the co-defendants in the drug trafficking conspiracy, he confirmed the spelling of his last name: "Q. Okay. And so - - for the court reporter, is Alfarabick spelled A-l-f-a-r-a-b-i-c-k? A. Yes. Q. And Mally is M-a-l-l-y? A. Yes. Q. Is that your birth name? A. Yes." *Partial Tr. of Proceedings, Jury Trial* 98:2-8 (ECF No. 412).

Alfarabick Mally's brother Kelvin Mally was also charged as a co-defendant. *See United States v. Manuel Trinidad-Acosta*, No. 1:11-cr-00205-JAW. Alfarabick Mally testified that Kelvin Mally is his little brother and that Kelvin's last name is spelled Mally. *Partial Tr. of Proceedings, Jury Trial* 102:25-103:6 (ECF No. 412). Kelvin Mally was indicted, went to trial, was convicted, and was sentenced under the last name spelled Mally. *Second Superseding Indictment* (ECF No. 663); *Jury Verdict Form* (ECF No. 767); *J.* (ECF No. 858).

It is beyond strange that the affidavit Mr. Stile submitted signed by Alfarabick Mally misspells his own birth name and contains a signature markedly unlike his acknowledged signatures on his plea agreements. Furthermore, as the Magistrate Judge pointed out, although Alfarabick Mallay's statement is titled "Affidavit", it is signed but not notarized. *Recommended Decision* at 16, n.14. With these significant foundational issues, the Court may well have refused to consider Alfarabick Mally's statement at the Stile sentencing hearing and the presentation of this affidavit may well have hurt Mr. Stile.

but that Mr. Stile told him the future victim had made a sexual advance to Mr. Stile. *Id.* Mr. Mallay stated that Mr. Stile told him that the future victim's sexual advance was instigated by a muscle-bound inmate that the future victim had been paying for protection from the victim's food at meals. *Id.* Mr. Mallay states that before Mr. Stile's sentencing, Attorney Peter Rodway, Mr. Stile's defense lawyer, contacted him and that he told Attorney Rodway what occurred. *Id.*

The Court agrees with the Magistrate Judge that Mr. Mallay's affidavit presents no probative evidence about the true reason Mr. Stile assaulted the victim because Mr. Mallay's actual knowledge is based solely on what Mr. Stile told him. *Recommended Decision* at 16 ("Given the information presented during the sentencing hearing regarding the assault, even if counsel could have offered the witness's statement, the testimony would have been in essence an account of what Petitioner told the witness and thus would not have carried significant weight, particularly given the Court's credibility assessment"). Mr. Mallay concedes that he did not see what happened under the table, that he knows what happened only because Mr. Stile told him, and that it was Mr. Stile's belief that the muscle-bound inmate instigated the sexual advance. Of course, if the assault victim were Mr. Stile's cellmate, it would be odd that the victim would sexually approach him in the middle of a prison dining room and that Mr. Stile would not have reacted immediately, instead of deciding to physically assault the victim some time later.

Moreover, there is nothing in Mr. Mallay's statement that contradicts any of the Court's findings about the motive for Mr. Stile's assault. Even if the story about

the sexual approach were accepted (and the Court does not do so), none of this negates the Court's detailed findings at the sentencing hearing about Mr. Stile's motive for assaulting the victim. In other words, accepting Mr. Stile's version does not eliminate the possibility that he could have decided to assault the victim both because of the victim's sexual approach and because the victim cooperated with law enforcement against him. In short, under First Circuit law, the Court is barred from considering in Mr. Stile's § 2255 motion the same issue that the First Circuit addressed and rejected on direct appeal, and to the extent it is not barred, the new evidence does nothing to alter the Court's conclusions at Mr. Stile's sentencing hearing about obstruction of justice.

Regarding Mr. Stile's request that the Court take a "fresh view" of its conclusion that he committed perjury at the suppression hearing, Mr. Stile offers no new evidence or argument on this issue, only that the Court's finding at the sentencing hearing was somehow "tainted by defense counsel." *Stile Mot.* at 3. Mr. Stile's conclusory objection offers no reason to revise the Court's considered finding at his sentencing hearing that he failed to tell the truth while under oath during the suppression hearing.

### D. The Failure to Move for a Downward Departure Under U.S.S.G. § 5K2.0

The Court turns to Mr. Stile's primary basis for objecting to the Magistrate Judge's Recommended Decision: his defense counsel's failure to request a downward departure because of the conditions at Somerset County Jail in particular. In his objection, Mr. Stile "insist[ed]" that the Court view video exhibits 2, 4, and 35 in *Stile*

*v. Somerset County*, 1:13-cv-00248-JAW. The Court acceded to Mr. Stile's demand and viewed each of the requested videotapes.

### 1. The Videotapes[5]

#### a. Exhibit 2

Exhibit 2 is a videotape of a cell extraction fifteen minutes and thirteen seconds long. The lead corrections officer announces that the date is December 31, 2011, the time is approximately 13:45, and the purpose of the cell extraction is for medical evaluation of Mr. Stile. The officer states that Mr. Stile is in the midst of a hunger strike that has surpassed four days in duration. The officer says, "Per Policy 4.3 medical needs to assess him daily with his hunger strike," and that the extraction team is going to move Mr. Stile from his cell to the medical office for that purpose and then return him to his cell. He also states that Mr. Stile recently stated that he was too weak to stand to facilitate the officers' application of handcuffs through a small waist-height slot in his cell door.

When the extraction team arrives outside his cell, Mr. Stile is told to get off of his bed and come to the door for application of handcuffs through the slot. Mr. Stile replies that he cannot do so because he cannot stand up. The officers enter his cell, at which point Mr. Stile is on his hands and knees in the middle of the cell, presumably making his way toward the door. One officer presses Mr. Stile to the

---

[5]        In his objection, Mr. Stile "insists upon the Court reviewing these three videos to allow for a fair review as to whether the Petitioner qualifies as a person who should be granted a downward departure for the illegal conduct of his jailers when he was a pretrial detainee." *Stile Obj.* at 4. Mr. Stile mentions video of three cell extractions: (1) one occurring on December 31, 2011, depicted in Exhibit 2, (2) one occurring on January 5, 2012, depicted in Exhibit 4, and (3) another occurring later on January 5, 2012, depicted in Exhibit 35. *Id.*

floor with a large shield while others begin to place him in handcuffs and leg constraints. As they do so, Mr. Stile groans and complains about the force the officers are using, and the lead corrections officer tells Mr. Stile that he has witnessed him via surveillance camera walking to the toilet in his cell.

The corrections officers attempt to stand him up, and he groans, refers to his back, and reiterates that he cannot stand. The lead corrections officer says, "If you continue to refuse . . ." Mr. Stile interjects, "I'm not refusing. I have had two back surgeries." Immediately thereafter, one of the corrections officers appears to apply an electroshock device (perhaps a stun gun) to Mr. Stile, which makes a zapping noise and causes Mr. Stile to cry out. The officer repeatedly instructs Mr. Stile to stand up. Mr. Stile replies, "Stop shocking me. I can't. I've had two back surgeries." As the officers dress Mr. Stile with a security smock, he asks, "Why are you shocking me?" The officer replies, "Nobody's shocking you right now." Mr. Stile retorts, "You did shock me!" The officer answers, "Because you're refusing orders."

The corrections officers support Mr. Stile's arms, dragging him from his cell through the hallways of the prison to the medical department. The lead officer continually orders Mr. Stile to walk, and Mr. Stile continually replies that he cannot. The officer repeatedly characterizes Mr. Stile's failure to walk as "resisting," which Mr. Stile consistently denies. At one point Mr. Stile exclaims to the officers, "My shoulders, you're pulling them out."

The officers seat Mr. Stile in a chair in the medical department at which point he complains about pain in his wrists and states, "C'mon, what are you torturing me

like this for?" The lead officer responds, "Stop resisting." A female wearing a blue smock, who appears to be a nurse, takes Mr. Stile's blood pressure. Mr. Stile tells her, "They torture me," and complains of his wrists. While still in the chair, Mr. Stile states that he cannot walk due to two spinal surgeries. The lead corrections officer rejects the statement. The officer states that Mr. Stile is hurting himself by resisting and refusing orders. Mr. Stile states that he is physically incapable of complying. Mr. Stile asserts that he crawls to his toilet, and the officer asserts that Mr. Stile assaulted some of his staff recently.

The officers move Mr. Stile using the same procedure as before, supporting him under his arms and dragging him. Mr. Stile and the lead officer continue to disagree about whether Mr. Stile can walk. The officer claims to have seen Mr. Stile walk, while Mr. Stile states that he is trying to walk and would if he could. Mr. Stile offers to crawl instead. Soon thereafter, an officer lifts and carries Mr. Stile's legs such that they are no longer dragging on the floor and he is in a horizontal position. Once they arrive back at Mr. Stile's cell, the officers undo the leg constraints and handcuffs. They exit his cell.

### b.    Exhibit 4

Exhibit 4 depicts another a cell extraction. At the beginning, the lead corrections officer announces that the date is January 5, 2012, and that the time is 10:41 am. The video is sixteen minutes and thirty-four seconds long. The officer states that Mr. Stile is still on a hunger strike and, for that reason, requires daily checkups from medical personnel per Policy 4.3. The officer also states that Mr. Stile

continues to refuse to present his hands through the slot in his cell door for application of handcuffs and continues to state that the reason is that he is too weak. The officer states that Mr. Stile will crawl to the door but that he is "refusing all orders." The officer states that Mr. Stile is drinking milk, juice, and water. The officer states, "Please note during trying to get him to cuff up, Mr. Stile made multiple threats of harm to me."

When the officers arrive at Mr. Stile's cell, he is laying face-down on the floor, near the door, and he places his hands behind his back. The officers enter the cell. One presses Mr. Stile to the floor with a large shield while others place handcuffs, leg restraints, and a security smock on Mr. Stile. They repeatedly order Mr. Stile to stand up, to which he replies that he is physically unable and preemptively protests, "Do not shock me." The lead officer continues to repeat, "Mr. Stile, walk." He then applies an electroshock device to Mr. Stile, which causes Mr. Stile to cry out and exclaim, "Stop shocking me!" Mr. Stile and the officer continue to disagree about whether he can walk. Mr. Stile states, "Just take me where you gotta take me, please." The officers drag Mr. Stile, supporting his shoulders. Mr. Stile groans throughout the hallways as the group makes its way to a facility where a nurse is waiting. In transit, Mr. Stile states, with a vulgarity omitted here, "You can't make the blind see and the lame walk," and, "You're tearing my shoulder apart."

The officers hoist Mr. Stile onto a medical examination table, which causes him to cry out and complain of his back. A nurse begins to take his blood pressure and to indicate that he has been offered ibuprofen for his back pain but that he has refused

it. Mr. Stile instructs the lead officer to identify himself, to which the officer replies, "I don't have to identify myself." Mr. Stile says, "You shocked me unnecessarily." The officer replies, "You're resisting."

The officers attempt to get Mr. Stile to stand to weigh him. The lead officer says, "He has been standing." Mr. Stile replies, "Liar. You don't make the blind see; you don't make the lame walk." Mr. Stile goes limp, and the officers lift him by his arms, dragging him to a wheelchair. They transport him in the wheelchair to a laundry room where a scale is located, where they place him, seated in the wheelchair, on the scale. The nurse notes his weight. The officers wheel him to his cell. There they lift him out of the wheelchair and lay him on his bed. They remove his leg constraints and his handcuffs and exit his cell.

### c. Exhibit 35

Exhibit 35 begins with a corrections officer announcing to Mr. Stile that he is going to be transported to the medical department. There is no apparent date; however, in his objection, Mr. Stile states that "Video Exhibit 35 is of January 5, 2012 at 1910 hours." *Stile Obj.* at 4. The duration of the video is twenty-three minutes and forty-five seconds. Mr. Stile lies face down on the floor of the cell and tells the officer that he cannot stand up. Mr. Stile reiterates that he is physically incapable of standing. Two corrections officers enter his cell and handcuff him behind his back. As they do so, Mr. Stile says, "I can't stand, and I can't walk." The officers lift Mr. Stile to his knees. The officer repeatedly demands that Mr. Stile stand up. Mr. Stile protests that he cannot stand and cannot walk.

The officer warns Mr. Stile, "I am going to give you three orders. This is the first one: should you fail the third order, then an electronic device will be employed." The officer orders Mr. Stile twice to stand up. Mr. Stile replies that he cannot stand, that he is physically injured, and that if he could stand he would. Mr. Stile claims that he has not stood "for at least week," while the officer asserts that Mr. Stile walked earlier that same day. The officer applies the electroshock device to Mr. Stile three times, and Mr. Stile cries out, stating that they are burning him. He insists that he cannot walk. He returns to his knees, and another officer places a smock on him.

Two officers stand on either side of Mr. Stile and begin to lift him to a standing position. He goes limp. They drag him down the hallways of the prison with Mr. Stile occasionally groaning. They bring him to the medical department and lead him to an examining table. He complains that one of the officers has been kicking him; they deny it. A nurse is present and performs a brief evaluation of Mr. Stile. During the evaluation, Mr. Stile is sitting on the examining table and is quiet. The nurse asks him to stand up. The officers stand Mr. Stile up next to the table. He tells the officers that they are hurting him. The lead officer tells him that it is not their intent to hurt him and that "it needs to be [his] intent to cooperate and to try and help [him]self."

They bring him to a scale. He is on his knees on the scale. The nurse tells Mr. Stile that there is no physical reason he cannot stand. He says that he has had two spinal surgeries and cannot stand. He complains they are ripping his shoulders. The

officers produce a wheelchair and wheel him from the medical department through the hallways to the laundry room where he is weighed while sitting on the wheelchair. During this trip, Mr. Stile is silent.

After the weighing, the officers stand him up again. Mr. Stile goes limp and they drag him through the hallways with Mr. Stile groaning and complaining that the officers are hurting his shoulders. The officers are struggling to carry Mr. Stile. At one point, the officers place him on the floor. One officer behind him, holding his legs, and the other two on either side of him, holding both arms. They lift him off the hallway floor and carry him prone through the hallways. He is brought to his cell and placed face down on the cell floor. The officers remove his handcuffs and leg constraints and leave him face down on the cell floor covered in a smock.

### 2. Conditions of Confinement as a Basis for a Downward Departure Under U.S.S.G. § 5K2.0

Mr. Stile and the Government disagree about whether conditions of presentence confinement may serve as a basis for a downward departure under U.S.S.G. § 5K2.0. In his Recommended Decision, the Magistrate Judge quoted the only First Circuit case to address the issue, *United States v. Ortiz*, 6 F. App'x 46 (1st Cir. 2001):

> [T]his court has never before held that conditions of confinement constitute a permissible basis for downward departure. Although some district courts have granted a downward departure on that basis, "no clear consensus exists as to the propriety of granting a downward departure for conditions of pretrial confinement."

*Recommended Decision* at 9 (quoting *Ortiz*, 6 F. App'x at 48) (quoting *United States v. Francis*, 129 F. Supp. 2d 612, 615 (S.D.N.Y. 2001)). Hence, it is an open question

whether under First Circuit law, a downward departure based on conditions of confinement would be permissible. If such a downward departure is warranted, it would seem applicable to the highly unusual case where the conditions of confinement are so harsh that the affected inmate has effectively served more time than a typical inmate serving the same sentence.

As the Second Circuit Court of Appeals and the Magistrate Judge observed, the Sentencing Commission "has not categorically proscribed consideration of this factor." *United States v. Carty*, 264 F.3d 191, 196 (2nd Cir. 2001); *Recommended Decision* at 9 ("The sentencing guidelines do not proscribe a downward departure for pretrial conditions of confinement"). Assuming that a sentencing court could consider reducing a defendant's sentence because of conditions of confinement, the prison conditions would have to be to so severe as to take the case "outside the heartland of the applicable Guideline." *Carty*, 264 F.3d at 196 (quoting *Koon v. United States*, 518 U.S. 81, 109 (1996)). In *Koon*, the United States Supreme Court wrote that if a factor is not mentioned in the Sentencing Guidelines, the sentencing court "must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be 'highly infrequent.'"[6] *Koon*, 518 U.S. at 96 (quoting 1995 U.S.S.G. ch. 1, pt. A, at 6).

---

[6] In his objection, Mr. Stile writes that "the Magistrate's R & R is misguided in its conclusion that any such departure would be 'highly infrequent.'" *Stile Obj.* at 5. Mr. Stile is simply wrong. The Magistrate Judge quoted the "highly infrequent" language directly from the United States Supreme Court's *Koon* opinion concerning U.S.S.G. § 5K2.0 downward departures. Mr. Stile later acknowledges as much in his supplemental objection. *Stile Supp.* at 6.

In cases where courts departed downward because of presentence conditions of confinement, the conditions have been severe. In *Carty*, for example, the defendant charged and later convicted of participating in a conspiracy to distribute cocaine and heroin was held in a Dominican Republic prison for over eight months. 264 F.3d at 193. The Second Circuit described the conditions of confinement:

> Carty alleges that during that period he was subjected to cruel prison conditions. He was held in a four-foot by eight-foot cell with three or four other inmates. There was no light in the cell. He received ten to fifteen minutes per day outside of his cell to bathe and was allowed to make only one phone call per week. He had no running water in his cell. His only toilet was a hole in the ground. He was denied access to paper, pens, newspaper, and radio. While incarcerated in the Dominican Republic, he lost forty pounds.

*Id*.

*Francis* provides another example. In *Francis*, the defendant was arrested, charged and convicted of illegal reentry. *Francis*, 129 F. Supp. 2d at 613. The Southern District of New York described the conditions of confinement:

> Defendant was subjected to extraordinary stress and fear while housed at [the prison]. . . . [C]ertain aspects of the facility were virtually controlled by gangs and inmates, without effective supervision from staff. In addition to the psychological pressure, this Defendant was the victim of an attempted attack and threats. He suffered significant weight loss, stress, insomnia, depression, and fear as a result. . . . Defendant experienced extraordinary stress and fear for his safety, due to his being placed for thirteen and one-half months in an institution in which the conditions of confinement were below the conditions of confinement in federal institutions. While at [the prison], Defendant was the victim of an attempted knife slashing by another inmate and observed frequent fights between inmates; he was threatened by other inmates and gangs; the gang control of the telephones was a constant reminder of his insecurity; he was also denied access to a library with Spanish materials-the only kind that he could read; the visitation procedure sometimes denied him contact visits with his family and thrice denied him any type of visit at all; counsel visits were unusually

complicated; he lost approximately twenty pounds and had insomnia; and he was forced to live in the overcrowded situation of a prison operating at 150% of its capacity, with the daily stress and fear as a result of the overall lack of security and the presence of gangs.

*Id.* at 619.

*United States v. Rodriguez*, 213 F. Supp. 2d 1298 (M.D. Ala. 2002) is a very different but extreme example. The defendant was charged and later convicted of possession with the intent to distribute cocaine. *Id.* at 1299. While she was in pre-sentence custody at a city jail, a prison guard raped her. *Id.* The district court concluded that "to fail to take this rape into account in Rodriguez's sentence would mete out a disproportionate punishment to her, thus thwarting the Sentencing Guideline's express goal of equalizing sentences." *Id.* at 1303.

Mr. Stile cites three cases in support of his objection. In *United States v. Mateo*. 299 F. Supp. 2d 201 (S.D.N.Y. 2004), a female inmate charged and later convicted of participating in a conspiracy to distribute heroin was pregnant while housed at the Metropolitan Detention Center (MDC) in Brooklyn. *Id.* at 204. About three weeks before her expected due date, she began to experience contractions and, despite repeated pleas to the guards and later a physician's assistant, she was kept in her cell. *Id.* Finally, about fourteen hours after she first began to experience contractions, she was moved to the medical unit and she ended up giving birth while lying on an upright stretcher at the MDC. *Id.*

Later, still at the MDC, a male corrections officer accused her and a fellow female inmate of smoking in their cells and threatened to file a report unless the women undressed in front of him. *Id.* They complied. *Id.* When the officer returned

the next day and made the same demand, they refused and filed a formal complaint against the officer. *Id.* The defendant was seen by a prison psychiatrist with symptoms of post-traumatic stress disorder, anxiety, depression, low self-esteem, insomnia and substance abuse, and after the sexual harassment incident, she was placed on suicide watch. *Id.* at 204-05. Given these facts, the district court in *Mateo* departed downward but stressed that to depart downward under this provision, courts have limited relief to circumstances where "the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner." *Id.* at 208.

Mr. Stile also cites *United States v. Hernandez-Santiago*, 92 F.3d 97 (2nd Cir. 1992). In that case, the defendant was charged and convicted of participating in a conspiracy to distribute cocaine and cocaine base. *Id.* at 98. The district court departed downward three levels because the defendant had been held for twenty-two months in a state facility that the sentencing judge found was "harsher incarceration" than a federal prison. *Id.* at 100-01, n. 2. The *Hernandez-Santiago* Court did not describe the actual conditions in the state facility other than to state that the sentencing judge saw the conditions as harsher than those in federal prisons "because of [a] lack of educational and therapeutic programs." *Id.* On appeal, the Government did not challenge the district court's downward departure. *Id.*

Although Mr. Stile cites *United States v. Brinton*, 139 F.3d 718 (9th Cir. 1998) *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000) in support of his claim for a downward departure based on conditions of confinement,

this Court has pointed out that the Ninth Circuit was "decidedly skeptical about this downward departure." *United States v. Leland*, No. 1:03-cr-00033-JAW, 2012 U.S. Dist. LEXIS 28653, at *3 (D. Me. Mar. 5, 2012). The Ninth Circuit remanded the case to the district judge for resentencing and instructed the sentencing judge to "carefully consider the propriety of such a departure when it resentences Brinton." *Brinton*, 139 F.3d at 725. *Brinton* offers scant support for Mr. Stile's claim for a downward departure in his case.

### 3. Application to Mr. Stile's *Strickland* Claim

Applying these standards to Mr. Stile's case, the Court concludes that Mr. Strile's *Strickland* claim fails on the performance prong alone. *See Strickland*, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one"). Even before considering the particulars of Mr. Stile's case, the Court is skeptical with Mr. Stile's premise: namely, that defense counsel's failure to seek relief that the First Circuit has explicitly declined to recognize could constitute ineffective assistance of counsel. In assessing defense counsel's performance, a court is to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, finding deficiency only where, given the facts known [to counsel] at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." *Rossetti v. United States*, 773 F.3d 322, 327 (1st Cir. 2014) (internal quotations omitted). Attorney Rodway's decision not to pursue a downward departure under § 5K2.0 based on the conditions of Mr. Stile's

confinement does not approach that line, and his representation was well within what the Constitution guaranteed Mr. Stile.

Assuming such a downward departure would be permissible in the First Circuit, Mr. Stile has to show not merely that he would have been able to convince the Court that a § 5K2.0 downward departure would have been successful, but that his defense counsel's representation was deficient because he failed to raise the downward departure at the sentencing hearing.

The Court turns to whether a downward departure for conditions of confinement would have been warranted in his case. At the sentencing hearing, Mr. Stile would have been required to demonstrate that the corrections officers' treatment of him would have taken his case outside the heartland of the applicable Guideline for his crime, U.S.S.G. § 2B3.1. *Koon*, 518 U.S. at 96; *Statement of Reasons* Attach. 1 *Findings Affecting Sentencing* (ECF No. 580). The cases where courts have accorded a downward departure for conditions of confinement reflect conditions far more prolonged and/or egregious than those Mr. Stile experienced. *See United States v. Sutton*, 973 F. Supp. 2d 488, 493 (D.N.J. 1997) (a conditions of confinement inquiry focuses on the length and severity of confinement).

Mr. Stile points to three videos, depicting cell extractions that took place on two days: December 31, 2011 and January 5, 2012. In *Carty*, the defendant was jailed for over eight months in a Dominican Republic prison in a four-by-eight-foot unlit cell with three or four other inmates. *Carty*, 264 F.3d at 193. In *Francis*, the defendant was held for thirteen and one-half months in a violent, gang-controlled prison and

was attacked with a knife. *Francis*, 129 F. Supp. 2d at 619. In *United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003), the Eleventh Circuit upheld a downward departure based on conditions of confinement where an inmate spent six years in presentence confinement, of which five years were spent in twenty-three-hour-per-day lockdown, and where the defendant had not been outside for five years. *Id.* at 1219. It is true that in *Rodriguez* a female defendant was subjected to a single incident, but the incident was a rape by a male corrections officer. *Rodriguez*, 213 F. Supp. 2d at 1299.

Although Mr. Stile argues against all the actions of the corrections officers depicted in the videos, the Court does not view the routine actions of the corrections officers in extracting him from his cell, placing him in a wheelchair, wheeling him through the jail halls to the medical department and to the weighing room, and reversing the process to constitute permissible grounds for a conditions of confinement downward departure. The only behavior of the corrections officers in Exhibits 2, 4, and 35 that stands out is the use of an electroshock device on Mr. Stile. There are at least two ways of looking at the administration of shocks to Mr. Stile. From Mr. Stile's perspective, the shocks were gratuitous, designed to inflict pain on him because he was unable to cooperate with the extraction process, because of his significant back injury. In his view, the corrections officers administered shocks ultimately because of his medical condition.

As is apparent from the videos, however, the corrections officers viewed Mr. Stile's failure to cooperate with the cell extractions as a willful refusal—as opposed

to a blameless inability—to comply with direct orders. From their viewpoint, the consequence of his refusal even to stand or to minimally walk was that a team of corrections officers had to extract Mr. Stile from his cell, pull him up, hold him up, place him in the wheelchair, and reverse the process, a procedure made extremely arduous by the fact that Mr. Stile was essentially dead weight. During this difficult process, in the videos where he was shocked, the corrections officers repeatedly tell Mr. Stile that they know he can stand and walk because they have observed him doing so in his cell on the video monitoring cameras. If the corrections officers are correct, the administration of shocks during three separate cell extractions to prod Mr. Stile to cooperate with the cell extraction process would not, in this Court's view, merit a downward departure for conditions of confinement. Though not pleasant, if Mr. Stile was deliberately going limp to make the tasks of the corrections officers more onerous, the administration of the few shocks that the Court was able to observe would not justify a downward departure for conditions of confinement.

An unknown underlying fact is the veracity of Mr. Stile's claimed inability to stand or walk. The Court cannot resolve this factual dispute on the basis of this record, nor does it need to do so. As presented, the issue is not whether Mr. Stile could have successfully demonstrated that he was in fact physically incapable of moving and therefore the shocks were gratuitous. Rather it is whether his defense counsel acted within *Strickland* standards in failing to present this argument.

Several factors support Attorney Rodway's decision not to press the issue. Surely, the Government would have fought Mr. Stile's request for a conditions of

confinement downward departure. In preparation for the sentencing hearing, the Court viewed a videotape of Mr. Stile vigorously and violently assaulting a fellow inmate on December 20, 2011, a mere eleven days before his claims of extraordinary physical disability depicted in the video exhibits. Despite the fact that it would be highly unusual for someone to experience such a steep and unaccountable physical decline, Mr. Stile presented no medical evidence to corroborate that he was in fact so physically disabled that he was unable to stand, walk, or even move his legs. During some of his visits to the medical department, Mr. Stile refused to cooperate with even minimal nursing examinations. He refused physical examinations, and, during some of the videos, he told the nurse that he did not consent to any touching of his body. In less than two weeks, Mr. Stile sunk from striding across a prison common area, slamming his elbow into the face of another inmate, wrestling that inmate, and leaping on the inmate's back to being unable to even stand or move his legs. For Mr. Stile to refuse medical care in the face of this catastrophic physical decline is unaccountable.

Furthermore, the videotapes depict no evidence that Mr. Stile was even minimally attempting to cooperate with the cell extractions. He goes entirely limp, not moving his legs or feet, and requiring numerous corrections officers to lift him, physically move him, and transport him to and from the medical and weighing rooms. Jail Video Number 4, dated September 14, 2012, shows an overhead view of Mr. Stile standing naked in his cell and moving without any apparent discomfort. Nine months after the events depicted in Exhibits 2, 4, and 35, Mr. Stile demonstrated a physical

recovery inconsistent with his extraordinary disability in December 2011 and January 2012.

Had Attorney Rodway elected to go down this path, the Government may have sought to admit Mr. Stile's entire course of conduct during his incarceration at Somerset County Jail. The Court has limited evidence on this issue, but the corrections officers repeatedly asserted that Mr. Stile had spit at the corrections officers and, in fact, the corrections officers placed a spit mask on Mr. Stile during many of the transportations. Furthermore, the cell extractions depict Mr. Stile persistently using vile and derogatory language against the officers. The Court anticipates that Somerset County Jail would have brought to the Court's attention any evidence of Mr. Stile's misbehavior during his entire period of incarceration to demonstrate that his failure to cooperate was in fact a willful refusal to follow orders. If the Court agreed with the Jail, Mr. Stile's plentiful vulgarities and passive resistance would not have put him in a good light for sentencing purposes.

The Jail would have sought to justify the actions of its corrections officers. No doubt it would have sought to explain why it was necessary to repeatedly weigh someone who—like Mr. Stile—is on a hunger strike. It also would have detailed the cell extraction protocol. The corrections officers repeatedly told Mr. Stile that they had video of him standing and walking about in his cell before the cell extractions. The Court does not know whether the Somerset County Jail could produce such videos but assumes the officers would have testified in accordance with their stated observations. If the Jail produced evidence that Mr. Stile was feigning his disability

in a passive-aggressive manner, the Jail would presumably have put on evidence about its institutional policies regarding the use of electroshock devices and whether the use on Mr. Stile was consistent with those policies.

A defense lawyer could have reasonably decided that to prevail on the conditions of confinement downward departure, he would have had to present a civil trial within a criminal sentencing. The Court's patience for such an evidentiary hearing would have been sorely tested, particularly if the evidence showed some of Mr. Stile's actions in an unfavorable light.

Finally, even if all the evidence broke favorably to Mr. Stile, it is questionable whether he would have been entitled to a conditions of confinement downward departure. As has been noted, the cases where such departures have been granted reflect far more egregious and prolonged conditions than those experienced by Mr. Stile at the Somerset County Jail. In fact, courts have rejected requests for conditions of confinement downward departures in situations more evocative than Mr. Stile's. Prison is never a pleasant place. As the district court observed in *Mateo*, prison necessarily includes "a substantial amount of privation and suffering . . . . Within the bounds of what ordinary custodial conditions encompass is the inmate's endurance of some degree of known and expected, and even necessary indignities, humiliations, inadequacies and harsh conditions." *Id.* 299 F. Supp. 2d at 210. Thus, an inmate may expect to suffer "occasional shoves and knocks arising from necessary disciplinary encounters." *Id.* at 211. A prisoner must show that his conditions of confinement are extraordinarily atypical. *See United States v. Turner*, 569 F.3d 637,

642 (7th Cir. 2009) (stating that the inmate's claims would have to rise to the "truly egregious" level to be considered for sentencing relief); *United States v. Ramirez-Gutierrez*, 503 F.3d 643, 646 (7th Cir. 2007) (rejecting a conditions of confinement downward departure where the inmate was unable to obtain care for his broken tooth, lived in poorly ventilated quarters, and was given an inadequate opportunity to exercise during a two and one-half month incarceration); *United States v. Dyck*, 334 F.3d 736, 743 (8th Cir. 2003) (to obtain a downward departure based on conditions of confinement, a defendant would have to demonstrate the conditions were "so substandard or onerous as to take this case out of the heartland of cases").

Some courts require that a defendant pressing for a conditions of confinement downward departure produce comparative evidence from other jails to demonstrate that the conditions of his confinement fell outside the heartland of the applicable Guideline. *See United States v. Quattlebaum*, 283 F. App'x 98, 100 (4th Cir. 2008) (rejecting a conditions of confinement claim because "no comparative evidence corroborated his assertion that his pretrial confinement was atypically harsh"). Here, Mr. Stile has not produced or suggested he could produce evidence of how other jails would have handled his situation. With this background, it would not have been a foregone conclusion, even if all the Court resolved all disputed facts in his favor, that Mr. Stile would have made a case for a downward departure under § 5K2.0 for conditions of confinement.

Mr. Stile currently has pending a civil lawsuit against the County pursuant to 42 U.S.C. § 1983, *Stile v. Somerset County*, 1:13-cv-00248-JAW. In his amended

complaint, Mr. Stile is seeking monetary compensation based on the same allegations against Somerset County he currently claims should have led to a reduction of his sentence. *Id. Am. Compl.* ¶¶ 18-21. In this Court's view, his civil action is a more appropriate place to evaluate and redress his alleged mistreatment than to mitigate his punishment for crimes he perpetrated against victims with no connection to the Somerset County Jail.

If Mr. Stile's defense counsel had pressed for a § 5K2.0 conditions of confinement downward departure, the focus of the sentencing hearing would have shifted from Mr. Stile's violent and egregious robbery to a contested hearing about Mr. Stile's time in presentence confinement. This Court watched the videotape of Mr. Stile's robbery and it is chilling. At his sentencing hearing, the Court described Mr. Stile's pharmacy robbery:

> Turning to the nature and circumstances of the offense, at 5:20 p.m. on September 12, 2011, the Somerset County Sheriff's Office received a report of a robbery at E.W. Moore & Son Pharmacy in Bingham, Maine. The investigation revealed that the robber was an older male, tall and thin, with short hair. He came into the pharmacy wearing a dust mask over his mouth, sunglasses, a sweatshirt, jeans, baseball cap, and a windbreaker with a stripe across the back. He was also wearing purple gloves.
>
> As he entered the store, he pulled out a sawed-off shotgun. He went to the rear of the store, and he pointed the shotgun at the owner and the three females behind the pharmacy counter. He ordered the three females to lie on the floor behind the counter on their stomachs. A male customer entered the store, and the defendant ordered him to go behind the pharmacy counter with the employees.
>
> The defendant told the owner to fill up a black bag with narcotics, including hydromorphone and methadone. The defendant tied up the hands and feet of each employee and the hands of the customer with gray- and white-striped zip ties. Once the bag was full of drugs, the

defendant told the owner to lie down on the floor and he tied the owner's hands with zip ties. The defendant then exited the store.

The drugs that were taken included Adderall, Concerta, dextroamphetamine, hydromorphone, Fentanyl, Metadate, methadone, morphine, Nucynta, Ritalin, and oxycodone. The value of the drugs was $12,889.93. The defendant also took $417 in cash.

*Sentencing Tr.* 190:1-91:3.

What happened to Mr. Stile during his presentence incarceration at Somerset County Jail does not eclipse what Mr. Stile did to the innocent owner, employees and customer at E.W. Moore on September 12, 2011. At worse, the corrections officers used a stun gun on Mr. Stile; Mr. Stile pointed a sawed-off shotgun at the people in the pharmacy and tied them up. Even if Mr. Stile had been able to make a convincing case for a downward departure under the Guidelines, the Court would still have been required to engage in a 18 U.S.C. § 3553(a) analysis, balancing the nature of his crime against his history and characteristics. Mr. Stile perpetrated a crime of unusual violence. It seems incongruous to soften Mr. Stile's sentence for such a hard criminal act because he was subjected to electric shocks during three cell extractions. In the other cases where a downward departure for conditions of confinement has been granted or upheld, the defendants' crimes did not involve violence or the threat of violence. *Carty*, 264 F.3d at 193 (distribution of cocaine and heroin); *Hernandez-Santiago*, 92 F.3d 98 (distribution of cocaine and cocaine base); *Mateo*, 299 F. Supp. 2d at 204 (distribution of heroin); *Rodriguez*, 213 F. Supp. 2d at 1299 (distribution of cocaine); *Francis*, 129 F. Supp. 2d at 613 (illegal entry).

Even with the resort to force documented in Exhibits 2, 4, and 35, Attorney Rodway did not run afoul of *Strickland* by not to attempting to paint Mr. Stile as a victim. The basis for relief under § 5K2.0 for poor conditions of confinement is less than solid and even if provable, it is far from clear that Mr. Stile could have met the high bar for § 5K2.0 relief. A hearing regarding Mr. Stile's confinement focusing on his behavior and that of corrections officers could have backfired on Mr. Stile. Furthermore, the Court might have seen Mr. Stile's argument as an attempt to divert the Court from his own violent criminal conduct.

### E.     The Firearms Enhancement

In his supplementary filing, Mr. Stile objected to Attorney Rodway's failure to press his objection to the five-level firearms enhancement in hopes of obtaining a three-level reduction for acceptance of responsibility. The flaw in his argument is that if Mr. Stile had maintained his objection to the firearms enhancement and if the Court had ruled against him, any chance for a reduction for acceptance of responsibility would have been doomed. This is because in order to qualify for acceptance of responsibility, a defendant must "admit[] the conduct comprising the offense of conviction" and "truthfully admit[] or not falsely den[y] any additional relevant conduct." U.S.S.G. § 3E1.1, *Application Note* 1(A). Whether Mr. Stile was armed with a firearm when he robbed the E.W. Moore & Son Pharmacy would have been conduct "comprising the offense of conviction" and, if not, "relevant conduct."

Although a defendant is free to challenge a guideline enhancement based on a legal argument, he is not entitled to deny the facts underlying the offense of

conviction. Here, if the Court concluded that he in fact possessed a sawed-off shotgun (or possessed a handgun in his pocket as set forth in the Presentence Investigation Report), he would have been subject to the five-level increase under U.S.S.G. § 2B3.1(b)(2)(C) and he would have likely been denied acceptance of responsibility. Furthermore for Mr. Stile to have claimed that what looked exactly like a firearm was not really a firearm would not have been very effective strategy in trying to convince the Court to impose a more lenient sentence.

If Mr. Stile contested this issue at the sentencing hearing, the Court does not know what evidence the Government would have presented to prove that Mr. Stile possessed a firearm. But the standard for proof for this fact would have been more likely than not. The videotape of the pharmacy robbery quite clearly showed what looked like a sawed-off shotgun. There was no question but that during the robbery, Mr. Stile brandished what looked like a sawed-off shotgun at the pharmacy employees and the customer. It remains to be seen whether an agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives, who are uniformly extremely knowledgeable about firearms, could have identified the shotgun as a firearm within the meaning of the Guidelines, U.S.S.G. § 1B1.1, *Application Note* 1(G). It would not have been surprising if an agent identified the make, model, and year of manufacture of the shotgun based on the contents of the robbery videotape alone sufficient to sustain the more probable than not standard of proof at the sentencing hearing.

With this backdrop, the Court does not conclude that Attorney Rodway's advice to forego contesting the firearm enhancement in hopes of gaining acceptance of

responsibility falls below the *Strickland* standard. To the contrary, the advice was wise. Even though the Court ended up denying Mr. Stile the three-level for reduction of acceptance of responsibility, it was for reasons other than Mr. Stile's denying—as he is now doing—that the shotgun he carried into the pharmacy and brandished during the robbery was really a firearm.

## IV.    SUMMARY

The Court performed a de novo review of the entire record and of the Magistrate Judge's Recommended Decision and the Court affirms the Recommended Decision for the reasons set forth in the Magistrate Judge's October 6, 2017 Recommended Decision. Specifically, the Court agrees with the Magistrate Judge that Mr. Stile failed to demonstrate that an evidentiary hearing is warranted, that Mr. Stile's motion for habeas corpus relief is properly rejected, and that Mr. Stile failed to make a substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2) and therefore any request for a certificate of appealability must be denied.

## V.    CONCLUSION

The Court ORDERS that the Recommended Decision (ECF No. 669) be and hereby is AFFIRMED and the Court DENIES James Stile's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 637). If James Stile seeks a certificate of appealability, the Court DENIES the certificate.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 10th day of April, 2018